Jane MITCHELL, Plaintiff-Appellee,

v.

MID–CONTINENT SPRING COMPANY OF KENTUCKY, Defendant-Appellant.

No. 77–3009.

United States Court of Appeals,
Sixth Circuit.

Argued June 5, 1978.

Decided Sept. 8, 1978.

Opinion On Rehearing Nov. 9, 1978.
See 587 F.2d 841.

Thomas M. Hanna, St. Louis, Mo., William E. Scent, Keith, Scent & Osborne, Hopkinsville, Ky., for defendant-appellant.

James W. Owens, Paducah, Ky., James C. Hickey, Ewen, MacKenzie & Peden, Louisville, Ky., for plaintiff-appellee.

Before PHILLIPS, Chief Judge, and WEICK and CELEBREZZE, Circuit Judges.

WEICK, Circuit Judge.

This class action was brought in the District Court by plaintiff-appellee, Mrs. Jane Mitchell (Mitchell), against defendant-appellant, Mid-Continent Spring Company of Kentucky (Mid-Continent), a corporation, her employer, alleging sex discrimination against her and on account of her discharge for engaging in protected activity, in violation of § 703(a) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a), and requesting equitable relief.[1]

The suit was brought in Mitchell's own behalf and in behalf of the class of all females employed by Mid-Continent on or after July 2, 1965, the effective date of the Act, all of whom, she alleged, were discriminated against with respect to wages and job assignments. The District Court certified the Class, as prayed for.

Following a bench trial the District Court found in favor of Mitchell and her class, in all respects. The issue of back pay was referred to a Special Master, who recommended that Mitchell recover on her individual claim $24,528.86 in back pay, and that an additional $222,885 be divided among all members of the plaintiff class, according to a formula and certain qualifying criteria. The Court accepted these recommendations and entered judgment therefor, and ordered Mitchell reinstated if she desired; and, in addition, the Court awarded Mitchell and the class a total of $75,000 in attorneys' fees, plus expenses of $2,427.32. Finally, the Court ordered injunctive relief against further discrimination and imposed an affirmative action plan, including the imposition of a quota of 33⅓% of all new female employees to be assigned to formerly male job classifications, for the next five years, and 33⅓% of all newly hired males to be assigned to formerly female job classifications for the next five years. Mid-Continent was also required to make reports to plaintiff's attorneys.

For the reasons that follow, we are of the view that the judgment of the District Court should be affirmed only with respect to relief granted plaintiff Mitchell, individually, and the injunction against further discrimination. We reverse the judgment with respect to the issue of class-wide liability for back pay, totaling $222,885, the affirmative action plan involving quotas, and the award of attorneys' fees plus expenses.

I

Mitchell was first employed by Mid-Continent on August 6, 1962. In early 1969 she contacted the Wage and Hour Division of the United States Department of Labor, alleging that the Company discriminated against female production workers. An investigation was made during the period of July 2–18, 1969, by Compliance Officer Her-

---

1. The original complaint in this case was filed on April 12, 1971. On November 16, 1971 the District Court granted summary judgment for defendant on the ground that plaintiff's charge had not been referred to the Kentucky Human Rights Commission, as required by 42 U.S.C. § 2000e–5(b). On appeal this Court vacated the judgment and remanded with instructions to retain jurisdiction long enough to permit such resort to available state remedies. *Mitchell v. Mid-Continent Spring Co. of Ky.*, 466 F.2d 24 (6th Cir. 1972), *cert. denied*, 410 U.S. 928, 93 S.Ct. 1363, 35 L.Ed.2d 2d 589 (1973). In her amended complaint, styled "Second Amended Complaint," plaintiff alleged exhaustion of all such remedies, and this is no longer an issue in the appeal.

bert L. Livingston. At the conclusion of his investigation Livingston advised Louis Langhi, President of Mid-Continent, that although no violations of the Equal Pay Act had been found to exist, the Company's practice of assigning higher-paying jobs exclusively to males (which will be discussed further, below) appeared in his opinion to be in violation of Title VII. Livingston recommended that Langhi contact the EEOC for assistance in bringing the company into compliance.

Langhi became incapacitated subsequently in 1971, because of brain surgery which left him virtually unable to speak, and partially paralyzed. His wife then assumed control of the company.

On or about July 29, 1969 Mitchell mailed a letter of complaint to the Cleveland Regional Office of the EEOC. This letter constituted a charge of discrimination under EEOC guidelines. 29 C.F.R. § 1601.-11(b). The EEOC replied on August 1, enclosing two blank EEOC charge forms, one for plaintiff's use and one for the possible use of employee, Louise McGehee, who had been promoted from her lower-paying machine operator position to a higher-paying inspection position, immediately after the Wage and Hour investigation.

On August 7 Mitchell approached McGehee, while in the company parking lot, before working hours, and asked her if she would like to make a complaint. McGehee refused, and reported to her foreman, Clyde Warren, that Mitchell had asked her to sign a complaint regarding wages, which complaint was to be sent to the federal government.

On August 11, 1969, Jane Mitchell was instructed to come to the office of Ward Mitchell (no relation to Jane), the company's plant superintendent. Clyde Warren and others were present at the meeting. There was discussion about the Government papers that Mitchell had been circulating, after which Ward Mitchell took from his desk drawer Jane Mitchell's final paycheck, which was already prepared. In Mitchell's words, he said, "I'm going to tell you, you are a good worker, but you're a trouble maker . . . . I'm going to have to let you go." (App. 154).

On August 14, Jane Mitchell made a second complaint to the EEOC, charging a retaliatory discharge. She was granted leave by the EEOC to file this suit.

On the basis of this evidence the District Court found that Mitchell was fired in retaliation for having engaged in protected activity in violation of § 704(a) of Title VII, 42 U.S.C. § 2000e–3(a).[2] She was awarded back pay of $24,528.86, and, if she so desired, was ordered reinstated in her previous employment with full seniority and benefits.[3]

On appeal Mid-Continent asserts two justifications for Mitchell's discharge. First, Mid-Continent claims that Mitchell violated the company's rule against solicitation on company property. The District Court specifically rejected this defense on the ground that the employee handbook issued by the company did not list this offense as one justifying immediate discharge, and no employee had ever been discharged for viola-

---

**2.** Section 704(a) of Title VII, 42 U.S.C. § 2000e–3(a), provides:

 (a) It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has

made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter. In the alternative, the District Court found the defendant liable under the analogous section of the Fair Labor Standards Act, § 15(a)(3), 29 U.S.C. § 215(a)(3). Because liability under Title VII adequately supports the Court's judgment, it is unnecessary for us to consider this portion of the Court's conclusions.

**3.** No contention has been made by the Company on appeal with respect to the amount of back pay awarded to Mitchell.

tion thereof. Further, the rule applied only to solicitations during business hours; and the solicitation of McGehee took place before business hours.

Second, Mid-Continent cited past instances of boisterous behavior and misconduct, including disputes with other employees, on Mitchell's part. The last such incident, however, took place at least a year prior to the discharge, and Mitchell had continued to receive regular pay increases during her entire tenure. No negative remarks had been entered on her personnel record.

Section 704(a) has been construed broadly to prohibit "discrimination against applicants or employees for attempting to protest or correct allegedly discriminatory conditions of employment." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 796, 93 S.Ct. 1817, 1821, 36 L.Ed.2d 668 (1973). Mitchell's action in filing a charge with the EEOC was plainly protected by this section. *See Hicks v. ABT Assoc., Inc.*, 572 F.2d 960, 968–69 (3d Cir. 1978); *Pettway v. American Cast Iron Pipe Co.*, 411 F.2d 998, 1004–07 (5th Cir. 1969).

■ We hold that the District Court's findings of fact supporting Mitchell's individual claim are supported by substantial evidence and are not clearly erroneous. We therefore affirm this portion of the judgment.

## II

Mid-Continent is a manufacturer of precision springs. The plant contains fifteen departments, each headed by a foreman, and each department consists of a separate job category. The manufacturing process begins when wire of the proper specifications is sent to the coiling department, where the machines are "set up" to produce springs according to customer specifications. After coiling, the springs are tempered by heat-treatment and then tested. At this point the springs are sent to other various departments for further processing: to Secondary Operations for sizing on a "kick press," if needed; to the grinding room; to "hopper-looper," where loops are placed on the ends of the springs; to "four-slide," where angles are formed in the springs; to torsion, which further coils springs and attaches "legs"; or to the paint department.

In both Secondary and Grinding operations the work is light, and the female machine operators in these departments remain seated while working. In Secondary, the female workers operate kick presses, and in Grinding they load and unload grinding machines, both relatively unskilled tasks. In the other departments, however, the work is heavier and is more difficult. In the set-up functions, workers are required to make precise, mathematical computations and adjustments with complex machinery in accordance with both blueprints and written specifications. These functions require skill and training, which many women either do not possess or do not desire to undertake. Other positions require various amounts of lifting of heavy coils of wire and quantities of springs, exposure to high temperatures, and untidy work conditions. These departments also require employees to work during the second or night shift when necessary to fill customers' orders. Married women who have young children, or who live in the country, did not like the night shift.

Consequently, employees who perform these more difficult jobs are higher paid than are machine operators in the Secondary and Grinding departments. These more difficult jobs have been performed traditionally by men employed by the company. As of August 6, 1973, machine operators started at $2.10 per hour and reached a maximum of $2.35 per hour after eighteen months. Set-up jobs, on the other hand, paid $2.20 per hour to start and reached a maximum of $2.95 per hour after four years. The remaining job classifications at Mid-Continent were also higher-paid than machine operators, starting at $2.20 per hour and reaching $2.75 per hour after four years.

The record shows, and the District Court found as fact, that between July 2, 1965 and the time of the judgment, no female

had ever been assigned to set-up, or to any other of the higher-paying positions.[4] On the other hand, no male had ever been assigned to the machine operator classifications in Secondary and Grinding.[5] Further, no male had ever been transferred to the lower-paying positions, and only two machine operators had ever been promoted, under circumstances to be discussed below.

Mid-Continent did permit employee, Louise McGehee, to transfer from her machine operator position to the formerly all-male inspection function; she was the first female ever to make such a transfer. This promotion occurred in July, 1969, subsequent to the investigation by the Wage and Hour Division. McGehee testified (App. 257) that she applied for the job when she heard "a rumor in the plant" that the company was looking for a female to fill it.

Aside from McGehee, only one other female transferred from the machine operator classification to any other position between July 2, 1965 and the date of the judgment. This transfer occurred on May 3, 1973, after commencement of this litigation, when Velma Ezell became a clerk in Mid-Continent's shipping department.

This system of sex-segregated job classifications and assignments was aggravated by the absence, until May, 1974, of any company-wide posting of job vacancies, and of any procedure by which employees could formally bid on higher-paying jobs.

Finally, Mid-Continent maintained a discriminatory practice and policy with respect to shift transfers. Set-up employees, according to plant superintendent Ward Mitchell, were hired for both the day and the night shifts (App. 503), and a transfer between shifts was "[p]ermissible if they want to," subject to the needs of the company (App. 817). Female employees in Secondary and Grinding, however, were not permitted to transfer between the day and the night shifts (App. 502; see App. 789–92). Ward Mitchell acknowledged that the rationale for affording the male employees this more liberal policy was that "there was a shortage of men. However, females were easy to hire." (App. 819).

The consequence of this policy was that a shift change by a female was tantamount to a resignation and a rehire. In fact, two females, Casada and Stranger, actually did lose all seniority when they transferred, at their own request, from the night shift to the day shift.[6] (App. 303, 316, 499–501).

---

4. Finding of Fact No. 15, App. 35, reads as follows:

 Males have been employed and assigned exclusively since July 2, 1965, to the following job classifications: maintenance, inspection, torsion set-up, grinding set-up, coiler set-up, kick press set-up, four slide set-up, sample and heavy bench, hopper-looper set-up, truck drivers, shipping, warehouse and receiving, weighman, and janitor. on November 19, 1973, there were 95 men and no women employed in these classifications.

5. Finding of Fact No. 14, App. 35, reads as follows:

 The E.E.O.C. investigation and the record in this case reveal that females were employed and assigned exclusively to the machine operator classification in secondary operations and grinding from July 2, 1965 to the present. No males have ever been assigned to that classification. On November 19, 1973, there were 124 female machine operators employed by Mid-Continent.

6. There was, however, evidence at trial that the two females in question had subsequently been granted full seniority. (App. 303–04, 315–16, 501). This evidence does not affect the Court's finding of a company policy of discouraging transfers by females.

Also asserted by Mitchell to be relevant to this issue is the testimony of employee Icie Lawrence. Lawrence was first hired on the night shift in November, 1958. She testified that she forfeited fourteen months' seniority in January, 1960, when she began work on the day shift in Secondary Operations. Her testimony was as follows (App. 301–02):

 Q Did you ever in the time that you were at Mid-Continent, transfer between night and day or day and night shifts? . . .

 A Well, I went to work the fifth day of November in '58 and I worked those two months in that year. Then, twelve months in '59 and then I went back on—I quit the last day, working day in December of '59 and then I went back on Monday morning, first work day, and I asked 'em to come on days . . . .

[Emphasis added.]
The obvious import of this testimony is that Lawrence lost her seniority because she quit, not because of a discriminatory transfer policy.

The District Court found as fact that the company's policy was to consider transfer requests by males if they suited the company's needs but not to so consider the requests by females. Finding of Fact No. 20, App. 36.

A further consequence of the transfer policy was that the seniority records of female employees were divided into separate day and night lists, while the records of males were not so divided. Finally, separate male and female seniority lists were kept which had the effect of segregating employees for seniority purposes, not by shift or by department, but by gender. The District Court found this system to be contrary to the EEOC guidelines set forth in 29 C.F.R. § 1604.3.[7]

On the basis of the preceding evidence the District Court found as fact:

> "[f]emale production employees were and are restricted and limited to the machinery operator classification, a base rate job, while men work in generally higher paying job classifications and have and can transfer [sic] to higher paying job classifications." Finding of Fact No. 18, App. 36.

The Court concluded that the practice of steering females into the lowest-paying positions constituted discrimination and segregation on the basis of sex in violation of § 703(a) of Title VII, 42 U.S.C. § 2000e–2(a).[8] The company's discriminatory shift-transfer and seniority policies were held to be further violations.

We affirm these holdings as supported by substantial evidence. They are supported by the testimony of the Company's own plant superintendent, Ward Mitchell.

Ward Mitchell made all hiring and assignment decisions. (App. 783, 786). He stated that he assigned females only to lower paying positions because "that's the type of work that's open for them to do." (App. 787). The only justification asserted for this attitude was that the other positions required lifting. (App. 787, 794–95). However, no tests were made of job applicants' physical strength (App. 788, 795) and no studies were made of the weight-lifting, skill, intelligence or dexterity requirements of any job in the plant. (App. 827). Neither specialized skills nor pre-employment training was required for any production job. (App. 788).

Rather than test applicants or impose requirements, Ward Mitchell simply believed that only men could successfully perform the Company's highest-paying jobs and that the females were not interested in these jobs. (App. 795–97, 826). In an answer to an interrogatory the Company admitted that sex was not a bona fide occupational qualification for any job in the plant within the meaning of Title VII. (App. 334–35).

In spite of this admission and in spite of the absence of any evidence of an actual lifting requirement, the Company maintains that it was merely being protective of its female employees, and argues that its "overprotective attitude" should not be held to constitute discrimination. Ward Mitchell also testified that he "never had one of the women in our plant down there come to me and want to get on the machines—not one."

 This argument has been consistently rejected and is without merit. Even a bona fide lifting requirement cannot be im-

---

7. Although not binding on the courts, EEOC guidelines constitute an interpretation of Title VII by the agency charged with its enforcement, and are entitled to great deference. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 431, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975).

8. Section 703(a) of Title VII, 42 U.S.C. 2000e–2(a) provides:
 (a) It shall be an unlawful employment practice for an employer
 (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
 (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

plemented by the blanket exclusion of all females. *Bowe v. Colgate-Palmolive Co.*, 416 F.2d 711, 718 (7th Cir. 1969). Rather, it may be implemented only by a valid test measuring strength directly. *Dothard v. Rawlinson*, 433 U.S. 321, 332, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977). Regardless of the difficulty of measuring individual characteristics, Title VII prohibits the use of popular stereotypes or even statistical data to "attribut[e] general group characteristics to each individual member of the group." *Manhart v. City of Los Angeles*, 553 F.2d 581, 586, 590–91 (9th Cir. 1976), *vacated and remanded on other grounds*, 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978). *Accord, Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 544, 90 S.Ct. 496, 27 L.Ed.2d 613 (1971) (Marshall, J., concurring).

■ The unlawful restriction of female applicants and employees to its lowest-paying positions, the Company's differential shift-transfer policy and its consequent maintenance of separate seniority lists constitute violations of Title VII. These policies placed burdens on females that males were not required to suffer. *Cf. Nashville Gas Co. v. Satty*, 434 U.S. 136, 141–42, 98 S.Ct. 347, 54 L.Ed.2d 356 (1977); *Palmer v. General Mills, Inc.*, 513 F.2d 1040, 1043 (6th Cir. 1975).

■ The Company also contends that the intent requirement of Title VII has not been proven, on the ground that there is no evidence that any females applied for promotions or even desired to work in higher-paying positions and therefore the Company never had occasion to "discriminate." We find this argument to be without merit for it misses the point. The standard of this Circuit under Title VII is that females must have *equal employment opportunities*, not merely that their applications, if any, be processed fairly. *Senter v. General Motors Corp.*, 532 F.2d 511, 529 n.58 (6th Cir.) *cert. denied*, 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150 (1976); *Palmer v. General Mills, Inc.*, 513 F.2d 1040, 1043 (6th Cir.

1975); *Head v. Timken Roller Bearing Co.*, 486 F.2d 870, 878 (6th Cir. 1973).

In *Dothard v. Rawlinson*, 433 U.S. at 330, 97 S.Ct. at 2727, the Supreme Court cautioned against the argument that a finding of unlawful discrimination must be based on the impact of defendant's (Company's) practices on actual applicants, stating:

> The application process might itself not adequately reflect the actual potential applicant pool, since otherwise qualified people might be discouraged from applying because of a self-recognized inability to meet the very standards challenged as being discriminatory. *See Teamsters v. United States*, 431 U.S. 324, 365–367, [97 S.Ct. 1843, 52 L.Ed.2d 396]. A potential applicant could easily measure her height and weight and conclude that to make an application would be futile.

In our case the District Court found on the basis of substantial evidence, that defendant (Company) exhibited the requisite disregard for the consequences of its acts to satisfy Title VII. Conclusions of Law Nos. 13, 14, App. 40. *See Dothard v. Rawlinson*, 433 U.S. at 328 & n.11, 97 S.Ct. 2720; *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n.15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

### III

Our agreement with the District Court on the liability issue, that a discriminatory system existed, does not conclude the matter, for the extent of the Company's liability for back pay to the class must yet be determined. At the time the complaint was filed, Section 706(g) of the Act, 42 U.S.C. § 2000e–5(g) read as follows:

> (g) If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include reinstatement or hiring of

employees, with or without back pay. . . . [9]

The District Court, after finding liability in its order of November 26, 1974, turned to the issue of back pay, stating: "Each female production employee at Mid-Continent from July 2, 1965 to the present, must now be given an opportunity to describe the harmful effect of discrimination on her individual employment position." Conclusion of Law No. 18, App. 41. On January 20, 1975, the Court appointed a Special Master to determine the back pay of each class member and provided guidelines, ordering, *inter alia*:

> 5. The Special Master shall devise a formula for computing the difference in wages earned by members of the class listed in Guideline 1 ["all female employees . . . who have been employed at any time from July 2, 1965 to the present time"], and male employees with the same or substantially the same date of hire by Mid-Continent. These differences . . . plus interest at 6% per annum shall be charted for each member of the class. . . . [Guideline 5, App. 46.]

> . . . . .

> 9. The Special Master should keep in mind that the defendant has the burden of establishing by clear and convincing evidence that the particular class member would not have earned the wages, even if Mid-Continent had not limited and segregated female employees . . . . [Guideline 9, App. 47.]

Pursuant to these guidelines, the Special Master devised the following formula for calculating the back pay due each class member:

(1) The differential between the average wage for females and the average wage for males for each year from 1967 through 1974 was determined from actual pay records of employees who worked the entire year, and conservative figures were estimated for 1965 and 1966.

(2) It was assumed that in the absence of discrimination, 25% of the "male" jobs existing in any year would have been held by females. The figure of 25% is the percentage of females in the local work force in Christian County, Kentucky according to the 1970 Census.[10] The number of jobs thus assumed to belong to females was multiplied by the male-female wage differential, to arrive at the total amount "lost" to the plaintiff class in each year.

(3) A list of eligible class members was compiled for each of the ten years at issue, consisting of all females who worked for the Company for at least six months during the given year. If a female worked a total of six months during two consecutive years, she was included in the year in which she worked the greater period of time. Thus, 92 of the 340 class members were excluded, leaving 238 persons eligible for back pay.

(4) The total amount of wages "lost" by females in each year was equally divided among all the eligible class members for that year.

The result of this computation (before minor adjustments) was that the maximum award for a female working the entire ten-year period was $2,631.40 and the maximum award for any one year was $312.25. The total award was $222,885, the average award amounting to $1,026.20.

The Special Master then discussed the burden of proof required to be borne by each individual member of the plaintiff class, in order to qualify for a share in the award thus calculated, pursuant to Conclusion of Law No. 18, App. 41. The Special Master described that burden as "very

---

9. Although on its face § 706(g) appears to contemplate that back pay will be awarded only as an adjunct to reinstatement or hiring, this section has been interpreted to permit the back pay remedy to stand alone. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 415–416, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975).

10. This assumption was unfounded. The fact that women comprise 25% of the work force in the county where Mid-Continent's plant is located is no evidence that 25% of the jobs at Mid-Continent which had been held by men between 1965 and 1974 would have been held by women.

light" and stated, quoting *Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211, 259–62 (5th Cir. 1974), that "[t]here is no way of determining which jobs the class members would have bid on and have obtained if discriminatory testing, seniority, posting and bidding system [sic] . . . had not been in existence." *Id.* at 260. In such a situation, involving a "quagmire of hypothetical judgment", *id.*, the Special Master found that "a class-wide approach to the measure of back pay is necessitated", *id.* at 261. This decision was based on the large number of class members (340), the total length of time involved (ten years) and the difficulty of isolating the effects of the various discriminatory assignment, seniority and transfer policies.[11] The Special Master, with the approval of the District Court, concluded as follows:

> [T]he initial burden has been met by all those female employees who were shown by company records to have been hired during the period involved and subsequently frozen into the female job classification for more than six months. In other words, those 238 class members determined to be eligible for sharing in one or all of the ten funds herein have met the initial burden of proof and it is now incumbent upon the defendant to show by convincing evidence that other factors would have prevented [sic] the economic loss determined herein regardless of the defendant's discriminatory employment practices. [App. 58.]

In taking this approach, the District Court did not have the benefit of the decision of the Supreme Court in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396

(1977). This decision acknowledged that "[a] consistently enforced discriminatory policy can surely deter job applications from those who are aware of it and are unwilling to subject themselves to the humiliation of explicit and certain rejection." *Id.* at 365, 97 S.Ct. at 1869. Nevertheless, the Court, with respect to non-applicants held:

> Individual nonapplicants must be given an opportunity to undertake their difficult task of proving that they should be treated as applicants and therefore are presumptively entitled to relief accordingly. . . . [*Id.* at 364, 97 S.Ct. at 1869.]

> A nonapplicant must show that he was a potential victim of unlawful discrimination. Because he is necessarily claiming that he was deterred from applying for the job by the employer's discriminatory practices, his is the not always easy burden of proving that he would have applied for the job had it not been for those practices. . . . [*Id.* at 367–68, 97 S.Ct. at 1871.]

> [T]he Government [plaintiff] must carry its burden of proof, with respect to each specific individual, at the remedial hearings to be conducted by the District Court on remand. [*Id.* at 371, 97 S.Ct. at 1873.]

In our case, the burden of proof was erroneously imposed on Mid-Continent by the Special Master and District Court. There was indeed evidence that some of Mid-Continent's female employees desired better jobs but were deterred by their belief that making an application would be a

---

11. In her brief, Mitchell states, at page 20:

> It is now totally impossible to determine in any way what individual female employees and new hires would have done and otherwise what would have happened if Mid-Continent had begun on the effective date of the Act, July 2, 1965, to assign male hires (there were 418) as machine operators and female hires to all other job classifications on a completely non-discriminatory basis.

> This is a frank admission that it is impossible for the individual class member to have her case determined without the use of a nebulous

formula, based in part on supposition, such as was devised by the Special Master and approved by the District Court. The amicus brief of the EEOC, under "Issues Presented", at 2, asserts the propriety of the use of the formula "in light of the impossibility of individual determinations in this case".

If it is true that individual determinations are impossible, the class action aspects of this case should forthwith be dismissed. No individual should ever be permitted to recover damages in a case which he or she finds it is impossible to prove.

"useless act serving only to confirm a discriminatee's knowledge that the job he wanted was unavailable to him," (431 U.S. at 367, 97 S.Ct. at 1870). There was testimony by several witnesses (App. 630–717) that the general assumption among Mid-Continent employees and management was that females were to keep in their place. Some females complained that they were subjected to harassment and disrespect by male employees, (e. g., App. 682–83, 714–17) and believed that if they applied for better jobs they would either be fired outright or be trained inadequately and then fired for incompetence.

On the basis of this evidence, the District Court found that "[a] female employee with knowledge of Mid-Continent's policies and practices could hardly be expected to make a meaningless and futile request to be transferred to a male job." Finding of Fact No. 16, App. 40. All of this, however, relates to the issue of liability and has no bearing on the remedy.

This showing was insufficient under *Teamsters* and the judgment must therefore be reversed. On remand, the District Court must determine the application for a job asserted by each individual class member. It will have the guidance of the Supreme Court's extensive discussion (431 U.S. at 367–72, 97 S.Ct. 1843) of the manner in which class members' burdens must be carried, (stating in part):

The task remaining for the District Court on remand will not be a simple one. Initially, the court will have to make a substantial number of individual determinations in deciding which of the minority employees were actual victims of the company's discriminatory practices. After the victims have been identified, the court must, as nearly as possible, " 'recreate the conditions and relationships that would have been had there been no' " unlawful discrimination. *Franks [v. Bowman Transportation Co.],* 424 U.S. 747 at 769, [96 S.Ct. 1251, 47 L.Ed.2d 444] 431 U.S. at 371–72, 97 S.Ct. at 1873.

At the evidentiary hearing on the remand, the Company will have the right to question the fitness of any applicant to perform the job which she seeks or to show that it has other persons it desires to hire who can better perform the work.

IV

In its conclusions of law entered November 22, 1974, the District Court held (App. 42):

20. The Court is aware that affirmative relief will be required to insure equal job opportunities at the Mid-Continent plant for present female employees and to insure that future hires will be assigned on a non-discriminatory basis. 42 U.S.C. § 2000e–5(g). *Castro v. Beecher,* 459 F.2d 725 (CA 1, 1972).

21. The Court is further aware that affirmative action on the part of Mid-Continent is essential to remedy the continuing consequences of past discrimination, and to insure that all employees understand that Mid-Continent is henceforth committed to equality of employment opportunity without regard to the sex of the employee.

■ Accordingly, the Court in its judgment of October 14, 1976 (App. 121–23), properly enjoined Mid-Continent from further discriminatory classifications and practices. The Court went further, however, and ordered an affirmative action plan as well. The Court ordered that for five years all vacancies in previously all-male positions were to be first offered to current female employees in order of seniority, and at least one-third of those persons transferring into such positions were to be female. Also, for a period of five years one-third of all newly-hired females were to be assigned to previously all male jobs, and one-third of all newly-hired males were to be assigned to previously all-female jobs. This plan was stayed by the District Court pending appeal.

We reverse this portion of the judgment, finding nothing in the record to justify such affirmative relief. Indeed, the Court's 1974 conclusion that affirmative action would be necessary is undercut by the subsequent

findings of its Special Master. On May 13, 1976, in denying back pay for 1975 and succeeding years, the Special Master stated (App. 97):

> The evidence presented at the hearing before the Special Master indicates that the defendant made several more bona-fide [sic] offers for job transfers to female employees during 1975 and 1976 [in addition to those in 1974], and that female employees began to bid on these jobs during 1975. Currently, two female employees are working in what were formerly male jobs. The Special Master has determined that *the "residual effects" of the company's prior practices and policies diminished greatly in 1975* as female employees began to realize that *formerly male jobs were, in fact, open to them.* [Emphasis added.]

The Special Master added that although no injunction had at that time been issued by the District Court, it was the Special Master's belief that the Court's 1974 findings against the defendant "may have had some effect" in eliminating the residual effects of defendant's prior discrimination. (App. 97).

In view of the eventual issuance of the injunctive relief and the finding that all jobs were, in fact, open to females, we see no factual justification for the imposition of the affirmative action plan.

## V

We also vacate the allowance of attorneys' fees of $75,000 and expenses in the amount of $2,427.32. On remand, the Court shall first determine at an evidentiary hearing the fair and reasonable value of the attorneys' services and expenses that should be allowed for legal services in representing Mitchell individually.

After the Court has determined the claims of each individual member of the class, the Court shall then determine the reasonable value of the legal services and expenses incurred in such representation on the remand. Because of our reversal of the judgment with respect to the class action aspects of the case, no allowance can be made for legal services and expenses incurred for prior representation of the class. The issue as to whether any modification of the injunction should be made can also be determined on the remand.

The judgment of the District Court is affirmed in part, reversed in part, and vacated in part, as hereinbefore ordered, and is remanded with instructions to conduct further proceedings consistent with this opinion. Costs in connection with Mitchell's individual claim are to be assessed against Mid-Continent as well as costs incurred by it.