Glenda J. DURANT and Carol
Geeck, Plaintiffs,

v.

OWENS–ILLINOIS GLASS CO., INC.,
Glass Bottle Blowers Asso. of the U. S.
& Canada, Glass Bottle Blowers Asso.
Local 167, American Flint Glass Work-
ers Union of North America, AFL–CIO,
and the Joint Apprenticeship Commit-
tee, Defendants,

Myrtle B. Zanca, Carmen M. Rubiera,
Shirley A. Feraci, Billie Mertz, Ruby L.
Singleton, Emmastine Haynes, Naomi
Ruth Wilmore, Lucille Stipelcovich, and
Lavonda Mantooth, Intervenors.

Civ. A. No. 76–3077.

United States District Court,
E. D. Louisiana.

June 3, 1980.

712

Sidney M. Bach, Joseph W. Thomas, New Orleans, La., for plaintiffs.

Steven A. Watts, Darleen M. Jacobs, New Orleans, La., for intervenors.

Steven D. Ridley, David F. Edwards, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Robert K. McCalla, McCalla, Thompson, Pyburn & Ridley, New Orleans, La., for defendant Owens-Illinois Glass Co., Inc.

C. Paul Barker, Louis L. Robein, Jr., Dodd, Barker, Boudreaux, Lamy & Garner, New Orleans, La., for defendants Glass Bottle Blowers Asso. of the U. S. & Canada and Glass Bottle Blowers Asso. Local 167.

William J. Oberhelman, Jr., Edward A. Champagne, Oberhelman & Champagne, New Orleans, La., for defendant Joint Apprenticeship Committee.

Victor H. Hess, Jr., Jackson & Hess, New Orleans, La., for defendants American Flint Glass Workers Union of North America and AFL–CIO.

**SEAR, District Judge.**

These are two consolidated class actions brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, for redress of alleged sex discrimination at the Owens-Illinois Glass Co. Bottle Manufacturing Plant in New Orleans. Plaintiffs seek review of the Findings of Fact and Conclusions of Law filed by United States Magistrate James D. Carriere, who presided over the trial of the liability issues as a Special Master.[1] Following trial the Magistrate recommended that judgment be granted in favor of defendants on all claims presented by plaintiffs but that defendants not be awarded attorney's fees. Following a review of the entire record, including the transcript of the proceedings held before the master consisting of 2,784 pages, and of the arguments and memoranda of counsel, I adopt the master's recommendation and dismiss plaintiffs' claims.

*Procedural History*

On August 23, 1973 Glenda Durant and Carol Geeck filed charges with the Equal Employment Opportunity Commission (EEOC) against their employer, Owens-Illinois Glass Co., Inc. (O–I); their international and local labor unions, the Glass Bottle Blowers Association of the United States and Canada (GBBA) and its Local 167; and the Joint Apprenticeship Committee (JAC),[2] a joint labor-management committee that administered the New Orleans plant's apprenticeship program. The two women al-leged that the respondents had refused to consider them for admission to the apprenticeship program because of their sex. In addition, they charged that the collective bargaining contract's maternity leave and insurance benefits provisions discriminated against women. The EEOC issued a right-to-sue letter on July 13, 1976, following which Durant and Geeck timely filed a class action against all of the above-named parties pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, asserting that sexually discriminatory practices pervaded the treatment of female employees at the New Orleans plant. On April 27, 1977 I certified a class consisting of all women who, from February 24, 1973 to final judgment, applied for employment, were employed, are employed, or will be employed at the O–I plant in New Orleans in production or maintenance positions.[3]

In the meantime, on February 4, 1977, a second group of female employees filed sex discrimination charges with the EEOC against O–I and the GBBA.[4] These employees, Myrtle Zanca, Carmen Rubiera, Shirley Feraci, Billie Mertz, Ruby Singleton, Emmastine Haynes, Naomi Wilmore, Lucille Stipelcovich, and Lavonda Mantooth, alleged that the respondents had failed to pay women the same wages as men for equal work at the New Orleans plant. On January 13, 1978, following the EEOC's issuance of a right-to-sue letter, these nine women filed their own Title VII class action based solely upon the equal pay claim. On the same day, they moved for leave to intervene in the Durant lawsuit. Leave was granted on February 1, 1978.

---

1. Issue was joined on July 28, 1977. The matter was referred to the Special Master on March 24, 1978 pursuant to 42 U.S.C. § 2000e–5(f)(5), more than 120 days having elapsed without the matter having been set for trial.

2. The American Flint Glass Workers Union, which represents certain employees at the plant, was also named in the EEOC complaint. The Flint Workers were voluntarily dismissed from the lawsuit which was subsequently filed.

3. Section 706(d) of the Civil Rights Act, 42 U.S.C. § 2000e–5(e), establishes a 180 day limi-tations period for the filing of charges of discrimination with the EEOC. Therefore, any discrimination claims which may have existed against the defendants for actions prior to February 24, 1973 are time-barred and outside the scope of this lawsuit. *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977).

4. As in the first claim, the Flint Workers were originally named as respondents, but after suit was filed, all claims against that union were abandoned. See n.2, *supra*.

As intervenors they raised no new claims but merely adopted the contentions already being made by Durant and Geeck on behalf of the class.

The two actions were subsequently consolidated for trial, although no class was ever certified in the *Zanca* suit, and all liability issues were referred for trial to Magistrate Carriere as a Special Master. The master held trial between September 25, 1978 and April 9, 1979 and issued findings of fact and conclusions of law on February 4, 1980. It is those findings and conclusions which are before me for review upon timely motion of the plaintiffs.

*General Factual and Legal Background*

At the O–I plant in New Orleans employees melt, form, and mold glass into bottles of various shapes and sizes. The plant is divided into nine different departments, each with its own responsibilities and its own hierarchy of positions. Exhibit D–6. The departments include:

(1) Batch and Furnace

(2) Mold and Machine Repair

(3) Forming

(4) Selecting

(5) Quality and Specifications

(6) Shipping and Storage

(7) Plasti-Shield

(8) Corrugated

(9) Maintenance

Employees of the Batch and Furnace Department are in charge of getting the raw material to the furnace, where it is melted. In the Forming Department the melted material is shaped and put into lehrs. As the bottles come from the lehr, employees of the Selecting Department check them for defects and pack them into boxes. Shipping Department employees move the packed boxes into the warehouse, from where they are shipped to the company's various customers.

The remaining departments perform the other tasks needed to keep the plant operating. For instance, the Mold and Machine Repair Department is responsible for keep-

ing the molding and furnace equipment in proper repair. The Maintenance Department is in charge of the electrical and water systems, the compressed air system, and general machinery. Quality and Specifications is a testing department in which employees perform quality control tests upon the bottles. In Plasti-Shield the employees attach styrofoam packing shields to certain types of bottles, and Corrugated Department employees prepare the cardboard that is used in the packing boxes.

Hourly employees in the Mold and Machine Repair Department are members of the Flint Workers Union.[5] All other hourly employees are members of the GBBA. However, workers in the Forming Department have a separate contract from the other GBBA workers and are considered a separate bargaining unit.

At the trial before the master plaintiffs attacked a variety of allegedly discriminatory employment practices at the New Orleans plant, which the master summarized as follows:

(A) Entry-level hiring

(B) In-grade promotions

(C) Supervisory level promotions

(D) Apprenticeship selection

(F) Maternity leave policy

(G) Insurance benefits policy

(H) Overtime and Sunday pay policy

(I) Working conditions in the Selecting Department

(J) Union representation of women

In addition to these class claims, plaintiffs pressed four individual claims, two of them stemming from the firing of Carol Geeck and Glenda Durant during the pendency of these lawsuits. The individual claims include:

(K) Harassment of Lucille Stipelcovich

(L) Harassment of Glenda Durant

(M) Firing of Glenda Durant

(N) Firing of Carol Geeck

The master found that the evidence presented at trial supported none of the

**5.** See nn.2 and 4, *supra.*

claims of discrimination and therefore recommended that judgment be entered in favor of defendants, although he further recommended that the defendants not be awarded attorney's fees. Plaintiffs appeal all of his findings save for those relating to the allegations of unequal pay and harassment of Durant.[6]

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court outlined the burdens of proof in a Title VII case. Plaintiffs must first make out a prima facie case of discrimination, which can be done through statistics as well as other evidence. The burden then shifts to the defendants, who must then provide legitimate non-discriminatory reasons for the disparate impact of their practices. Plaintiffs may still succeed if they can prove these reasons are pretexts for discrimination. In accordance with this standard I have examined the various claims made by the plaintiffs.

A. *Entry-Level Hiring*

██ There are two entry-level hourly positions at the New Orleans plant—selector in the Selecting and Plasti-Shield Departments and offbearer in the Shipping Department. Selectors assemble boxes, check glassware for defects and package the ware. Offbearers, who as of July 1, 1976 were paid $0.27/hr. more than selectors, carry the packed boxes to storage in the warehouse. The statistics offered by plaintiffs show that before 1972, all newly hired women became selectors, while all newly-hired men became offbearers. These statistics were the outgrowth of a deliberate company policy, as evidenced by the fact that separate pre-employment tests were given to male and female job applicants. Tr. 778–93. Since 1972 both men and women have been hired as selectors, but the offbearer position has remained all male, despite the fact that 40% of the new employees hired during that time have been women. The plaintiffs' expert, Dr. Irving Lavalle, concluded that the post-1972 distribution could not be explained as the result of random selection. Exhibit P–9.

The master found that even if this statistical evidence established a prima facie case of sex discrimination in entry-level hiring, an issue on which he pretermitted decision, the fact was that no women had become offbearers since 1972 because no women wanted the job, the most physically demanding job in the plant. In short, he determined that the defendants had successfully rebutted the plaintiffs' contentions. Findings of Fact 1–3, Conclusion of Law 2.

There is substantial evidence to support the master's position. Under the union contract, whenever a non-supervisory job at the plant becomes available, the vacancy is posted and any employee interested in the job may sign for it. Tr. 1986. The employee with the most seniority out of those who bid gets the position, assuming that he or she is otherwise qualified.[7] The offbearer job has proven so unpopular that in recent years it has been continually posted, open to anyone in the plant. Tr. 2318–19.

The plaintiffs failed to identify a single class member who was interested in the offbearer position, and at least nine women have signed waivers in the last several years refusing the job. Exhibit D–2d. As part of the plant's Remedial Action Program, an affirmative action program for women instituted in 1975, O–I requested that female employees identify three jobs on which they would be interested in bidding, and no women identified the offbearer position. Tr. 2320. Moreover, Stephen Wise, the Industrial Relations Director at the plant beginning in January, 1977, testified that he had offered the job to women in layoff and recall situations, but they had

---

6. The master's findings of fact are to be adopted unless clearly erroneous. F.R.C.P. 53(e)(2). See *Neal v. Saga Shipping Co.*, 407 F.2d 481, 488 (5 Cir. 1969). Of course, if the master erred at any point in applying the law to the facts, I must correct that error.

7. Qualifications play a part only for those jobs which are considered skilled jobs, generally in rate group 10 and above. For instance, qualifications would play no role in determining which bidding employee would receive a vacant offbearer position. Tr. 2068–70.

still refused it. Tr. 1987–88. Three of the intervenors testified that they would not take the job if it were offered, and two others indicated they had little interest in it. Rubiera, Tr. 1655; Zanca, Tr. 1547; Feraci, Tr. 1205; Singleton, Tr. 161; Mantooth, Tr. 1350–51.

Plaintiffs contend that, despite the above, the master erred in rejecting their contention that the company's entry-level hiring policies discriminated against women. They note that much of the evidence which he cited concerns transfer of women already working as selectors within the plant and that while many of them may not have wanted to transfer to the difficult offbearer job for only $0.27/hr. more, new female employees might have been willing to take the job if offered. However, the evidence developed at trial fails to support this supposition. Plaintiffs could not identify a single woman who wanted the job. Women who had been laid off preferred to remain unemployed rather than to return to work as offbearers, which indicates that new applicants might have done the same. Finally, both Roger Hatch, Industrial Relations Director from May, 1975 until December, 1976, and Stephen Wise testified that new female hires were told of the availability of the offbearer job but that none would take it. Wise even encouraged women to take the job, but without success. Tr. 1987–89, 2317–22.

Plaintiffs also argue that the master's findings embody a stereotyped characterization of women like that rejected in *Weeks v. Southern Bell Telephone*, 408 F.2d 228 (5 Cir. 1969). In that case the defendant barred women from the telephone switchman's job on the grounds that it was too strenuous for women to perform. The Fifth Circuit rejected the argument that sex was a "bona fide occupational qualification" for the job, describing the defendant's position as "romantic paternalism." *Id.* at 236. The facts here are different, for the evidence shows that O–I has been willing to hire women as offbearers since 1972. It is unfortunate that in this case the women appear to fit the stereotype and have refused the strenuous work. The company cannot compel them to take the job.

The master's conclusion that women will not take the offbearer job, although it is open to them, is correct. The defendants have overcome plaintiff's statistical evidence, and I adopt the master's findings on this point.

### B. *In-Grade Promotions*

█ Dr. Lavalle also produced evidence which demonstrated that male hourly employees at the New Orleans plant have tended to receive wage increases faster than women. He examined the wage progression of 12 men and 19 women hired as selectors between 1972 and 1974 who were still working at the plant as of July 1, 1976. He found that the women were disproportionately concentrated in low wage jobs, whereas the men were more evenly distributed throughout the wage structure. Exhibit P–9, Tables IV and V. Plaintiffs argue that this statistical evidence proves that the in-grade promotion policy at the plant unlawfully discriminates against women. The master rejected plaintiff's argument and found instead that the reluctance of female employees to bid on open positions caused the skewed figures. Findings of Fact 7–11, Conclusion of Law 2. Once again, the evidence bears out his position.

Plant policy, as reflected in the collective bargaining agreements, has always been to allow incumbent employees to bid for open jobs within the plant. Prior to 1974 a departmental seniority system was in effect, and qualified employees already working in a department received a preference for the higher-level positions within that department. If no department employees bid for the job or if the lowest level position within a department was at stake, then the qualified bidder with the most plantwide seniority was awarded the job. In 1974 the collective bargaining contract was altered to provide that plantwide seniority would determine who among the qualified applicants received any posted job. Departmental seniority is no longer relevant for job placement.

The master found, and plaintiffs do not appear to dispute seriously, that both seniority systems are bona fide—i. e., neither had its genesis in sexual discrimination. Finding of Fact No. 8. See *Teamsters v. United States*, 431 U.S. 324, 355–56, 97 S.Ct. 1843, 1864–65, 52 L.Ed.2d 396 (1976). Carl Linder, General Counsel of the GBBA, testified that the departmental seniority system developed because of job lines which had existed in the industry historically. Tr. 2492–2510. There is no evidence that the departmental seniority system was instituted to discriminate in any way against female employees in the glass manufacturing industry. It follows that the plantwide seniority system substituted in 1974, which removed certain barriers to free employee movement imposed by departmental seniority, is also bona fide.

The master found that the failure of women to progress in salary as rapidly as men was caused by their failure to bid for better-paying jobs, for pay rates in any particular job are fixed by contract and are not subject to company or union discretion. In the Remedial Action Program referred to above, only three women evidenced any interest in jobs outside the relatively low-paying Selecting and Quality-and-Specification Departments. Exhibit D–5. In addition, the job postings from 1973 to the present show a marked reluctance on the part of female employees to bid into previously all-male departments. Of 72 postings for such positions from 1973 to 1977, women wholly failed to bid on 45 positions, and often they refused positions when they were offered. Exhibit D–2a, Tr. 2136.

Plaintiffs, citing *James v. Stockham Valves & Fitting Co.*, 559 F.2d 310 (5 Cir. 1977), and *Mitchell v. Mid-Continent Spring Co.*, 583 F.2d 275 (6 Cir. 1978), counter that

"formal and informal systems" of sex-based employment practices informed women that they were not wanted in certain traditionally male positions, thus inhibiting the exercise of their contractual right to bid for open jobs in the plant. They first note that until 1972 every prospective hourly employee was given a pre-employment test, but that men and women were given different tests, thus signalling that they were not to work together. However, this practice was discontinued in 1972 and is therefore beyond the scope of this lawsuit.[8] Plaintiffs contend that certain provisions of the Forming Department's collective bargaining agreements make clear that no women are wanted in that department. For instance, the 1971–74 contract failed to provide for funeral leave for the death of a husband, although it did grant leave for the death of a wife.[9] Similarly, the Forming Department contracts to this day contain no pregnancy leave provisions, unlike the Production and Maintenance contracts which cover the other GBBA employees.[10] In addition, plaintiffs point to the 1971–74 Production and Maintenance Contract, which provided that if both husband and wife worked at the plant, only the husband could enroll the dependents in the company insurance plan.[11] They contend that this provision is further evidence of female employees' second-class status at the plant.

Plaintiffs attempt to link these fragments of evidence with the testimony of Jeffrey Barach, a Tulane Business School professor. Barach testified as an expert in "management principles" and noted that "informal systems" as well as "perceived organizational structure" at the plant, presumably including the evidence discussed above, could have inhibited women from bidding on jobs outside the heavily female

---

8. See n.2, *supra*.

9. Subsequent contracts were altered to provide for leave for the death of a spouse.

10. Plaintiffs argue in passing that the existence of separate contracts itself violates Title VII. *Evans v. Sheraton Park Hotel*, 503 F.2d 177 (D.C.Cir.1974), upon which plaintiffs rely, involved a situation in which bargaining units

were rigidly segregated on the basis of sex. Plaintiff has not shown here that such was the cause of the Forming Department's all-male composition.

11. This provision was changed in 1974 to allow either parent, but not both, to enroll the dependents.

Selecting Department. However, Barach never took a psychology course in college; his business school thesis dealt with management principles as they relate to consumers, not employees, Tr. 444–46; he has never studied the New Orleans plant nor has he studied any other glass manufacturing plant, Tr. 513–14; and he admitted that many other factors, such as societal influences, self-confidence, and family background might influence a woman's job choices at the plant, Tr. 515. There is nothing at all persuasive about his testimony, and it is doubtful whether he should have been permitted to testify as an expert in the case.

It is possible that certain influences exist at the plant which tend to discourage women from applying for better-paying jobs. However, plaintiffs have been unable to uncover any of a serious nature. They argue from some isolated fragments of evidence, much of it now seriously dated, and from testimony of an expert who has never studied the plant and may well not be an expert in the field that the defendants discouraged women from bidding for jobs outside of the Selecting and Quality-and-Specifications Departments. Defendants demonstrated that the openings at the plant were posted in the main hallway and awarded on the basis of a sex-neutral seniority system. The weak evidence of "formal and informal systems" of sex discrimination offered by plaintiffs is insufficient to overcome that showing.

Both James and Mitchell, supra, are distinguishable. In James plaintiffs alleged that since 1965 the defendant had discriminated by race in making job assignments, and they presented sufficient statistical and other evidence to establish a prima facie case. Defendant attempted to rebut the prima facie case by showing that in many cases it had placed employees in jobs which they had selected themselves. The Fifth Circuit rejected this evidence as "factually insufficient and legally irrelevant." 559 F.2d at 334. The facilities at the factory had been totally segregated by race before 1965, and segregation had continued in various facilities and programs at the plant through 1974. Over two-thirds of the work force were assigned to jobs without assignment requests, and the assignment request statistics offered by the defendant did not reflect the number of blacks who sought traditionally white jobs and were rejected. Moreover, when workers sought promotions at the plant, seniority controlled only when the immediate supervisor decided that two or more applicants were approximately equal in qualifications. Most of the supervisors were white, which tended to impede the upward mobility of black workers. Under the circumstances the court concluded that for a black worker to have requested a position in an all-white department would have been a useless act. *Id.*

■ The evidence in this case is far different from that in *James.* Job mobility for all unskilled positions is governed solely by contract, and the employee with the most seniority is awarded the job regardless of sex. Even in skilled positions, assignments are made by seniority after the unqualified applicants have been eliminated. There is no evidence that a woman has ever been denied an hourly job due to lack of qualifications. Although entry-level job segregation by sex was the rule until 1972, the practice ended that year, and the company thereafter voluntarily initiated an affirmative action plan to encourage women to apply for positions in traditionally male departments. There is no evidence that for a woman to have bid for such a position would have been a useless act. Indeed, the evidence shows that on those occasions when they have bid for such positions, they have often been successful. Exhibit D–2a. Plaintiffs have not demonstrated that the barriers to mobility which existed in *James* exist here.

*Mitchell,* a Sixth Circuit case, is similarly distinguishable. In that case the defendant excluded its female factory workers from all of the heavier, more skilled jobs at the plants. The company contended that it was simply being protective, but the court correctly concluded that such protectiveness, based on an outmoded stereotype, violated

Title VII. It properly rejected the company's defense that no women applied for these heavier jobs, noting that in view of the company's sex-based job allocation policy, such applications would have been futile. 583 F.2d at 280–81. There has been no sex-based job assignment scheme in effect at the O–I New Orleans plant since 1972, and hence *Mitchell* is inapposite.

The master's findings in the area of in-grade promotion are correct. Women have failed to advance as a group as quickly as men because many of them, through no fault of the defendants, have chosen not to bid on better-paying positions. Therefore, this claim of discrimination must be rejected.

C. *Promotions to Supervisory Positions*

Until the middle of the trial, when Christine "Cookie" Kowalski was promoted to foreman in the Selecting Department, no woman at the New Orleans plant had ever been promoted from an hourly position to a supervisory position. Plaintiffs argue that this is the result of discriminatory factors which permeate the selection procedure which O–I has used in making its promotion decisions.

■ The procedure which O–I uses is rather informal. There are no written criteria used. Normally the head of the department involved, in conjunction with the plant manager, decides who should be promoted to a supervisory position from the hourly ranks with the Industrial Relations Director sometimes involving himself in an advisory capacity. In addition, the department head and plant manager sometimes discuss the issue with the foremen within the department. After gathering the information he feels is necessary, the department head chooses the person he believes to be most qualified, assuming his choice meets with the plant manager's approval. Tr. 2199–2204.

*Parson v. Kaiser Aluminum & Chemical Corp.*, 575 F.2d 1374, 1385 (5 Cir. 1978) outlines certain factors which have rendered similar supervisory selection procedures invalid in race discrimination cases.

... The procedure in effect at the time relevant to Parson's claim evidences many of the characteristics that we have long held violative of Title VII. In *Rowe v. General Motors Corp.*, 5 Cir., 1972, 457 F.2d 348, 358–59, we found that the following aspects of a promotion procedure were invalid:

(i) The foreman's recommendation is the indispensable single most important factor in the promotion process.

(ii) Foremen are given no written instructions pertaining to the qualifications necessary for promotion. (They are given nothing in writing telling them what to look for in making their recommendations.)

(iii) Those standards which were determined to be controlling are vague and subjective.

(iv) Hourly employees are not notified of promotion opportunities nor are they notified of the qualifications necessary to get jobs.

(v) There are no safeguards in the procedure designed to avert discriminatory practices.

These factors result in "procedures which depend almost entirely upon the subjective evaluation and favorable recommendation of the immediate foreman." They are therefore "a ready mechanism for discrimination against Blacks." *Id.*, at 359 ...

Some of the procedures which O–I employs are similar to those which are criticized in *Parson* and *Rowe*. There are no written criteria setting forth the qualifications necessary for supervisory positions. Moreover, there appear to be no formal safeguards in the procedure to avert discriminatory practices. However, there are some significant differences as well. First, the immediate foreman, while sometimes given input, does not make the promotion decision. Instead it is the department head, a higher level management employee, who must make the choice. This is important, for *Parson* and *Rowe* rely heavily on the expected antagonism between white fore-

man and black hourly employees, particularly given the lack of familial and social association between the two groups. Moreover, at the New Orleans plant, several persons render advice on supervisory promotions before any decision is made, thus making it more likely that the qualifications of all hourly employees who may be interested in the position are brought to the attention of the department head. This factor also sharply reduces the danger that the irrational prejudices of a single individual will poison the selection process.

None of this proves that the promotion procedure used by O–I passes muster under Title VII, for the selection process is sufficiently subjective so that sexual bias could affect the ultimate promotion decisions. However, the method used here, with its dependence on the views of higher management officials, is sufficiently different from those criticized in *Rowe* and *Parson* so that it is not a *per se* violation of Title VII. I must therefore examine the system in operation to see how much women hourly employees are affected.

In four departments, Quality-and-Specifications, Corrugated, Plasti-Shield, and Shipping, there have been no promotions of hourly employees to supervisory positions since February, 1973. Quality-and-Specifications has had no supervisory vacancies during this period, while all vacancies in the other three have been filled by transfers of supervisory personnel from other departments. Tr. 2023, 2029–37. Three other departments, Maintenance, Forming, and Mold and Machine Repair, include highly skilled hourly positions with which a supervisor must be familiar. Because of their reluctance to bid for jobs in these departments, no women have thus far possessed sufficient experience to qualify for supervisory positions, which have always been awarded to men with extensive experience in the hourly jobs. Tr. 1995–2004, 2023–28. The Purchasing Agent position, which has now been absorbed by the job of Plant Comptroller, required marketing experience and involved handling large amounts of money. Both post-1973 open-

ings for that position were filled by management personnel with college backgrounds who had been transferred from other O–I business locations. Tr. 2041–42. The sensitive position of Industrial Relations Director has been filled twice since 1973, both times by experienced management employees transferred from other O–I locations. Tr. 2038–40, 2315–16.

This leaves the Selecting Department. Since this department employs only unskilled workers, prior experience in the department is not necessary in order to qualify for a supervisory position. Tr. 2007–08, 2017. A 1973 vacancy in the position of selecting department foreman was filled by Michael McCartney, who was transferred from the position of Corrugated Department foreman as part of a reduction in salaried personnel. Tr. 2018. On September 18, 1978, Chris Theobold was demoted from Shipping Department supervisor to replace McCartney, who had been transferred to a position within the Shipping Department. Tr. 2018–19. The only post-1973 promotion of an hourly employee to supervisory level in the Selecting Department occurred on December 16, 1978, when Christine Kowalski was promoted to foreman. Tr. 2015.

In summary, women in hourly positions have not been qualified for supervisory positions in the Mold and Machine Repair, Maintenance, and Forming Departments because of their lack of experience, which has been caused by their self-imposed reluctance to bid for lower-level positions in these departments. Tr. 2044–45. No hourly employees, male or female, were promoted to supervisory positions in any other department, save for Selecting, where the sole promotion was awarded to a woman. *Rowe* and *Parson* are distinguishable, for the evidence shows that it has been the dearth of openings in those departments for which female hourly employees have been qualified for supervisory positions, and not discrimination, which has prevented their promotion. The master properly concluded that the procedure used by O–I to fill supervisory positions does not violate Title

VII. Findings of Fact 13–41, Conclusion of Law 2.

### D. *Apprenticeship Selection*

 In 1973 the company and the union established an apprenticeship program to provide opportunities for hourly employees to be trained in mechanical and electrical skills so that they might eventually qualify as journeymen mechanics in the Maintenance Department. They formed a Joint Apprenticeship Committee (JAC) to administer the program. The JAC established five basic requirements for admission:

(1) High school education

(2) Passage of a physical exam

(3) Age 18–38

(4) Passage of an Apprenticeship Battery test

(5) Approval by the JAC following an interview

The apprenticeship positions available in 1973 were posted in accordance with the union contract in effect at the time. After the JAC determined which applicants were qualified, it awarded the positions on the basis of departmental seniority which governed under that contract. More vacancies were posted during 1974, at which time the qualified applicants were chosen on the basis of plantwide seniority, which governed under a new collective bargaining agreement.

For the 1973 selections the JAC decided to waive the age, education, and testing requirements for incumbent employees of the maintenance department. Plaintiffs contend that this allowed some of those employees, all of whom were male, to qualify for apprenticeship positions to which they would not otherwise have been entitled. Because departmental seniority was used to select from among the qualified applicants, only maintenance department employees were chosen for the program in 1973. In particular, all female applicants, including Geeck and Durant, were rejected. In 1974, when more apprentices were selected, none of the five requirements were waived for any employees, and Durant was chosen for a position on the basis of her plantwide seniority out of the qualified applicant pool. Geeck was again rejected, this time because of her age.

Plaintiffs argue that the waiver of requirements in 1973 for employees of the all-male maintenance department violated Title VII, since it made it impossible for qualified women to obtain apprenticeship positions that year. The master's findings do not address this argument, for he reasons that since the apprenticeship positions were awarded pursuant to a bona fide seniority system, there was no discrimination. Findings of Fact 44–46, Conclusions of Law 3. If the qualified applicant pool was properly determined, he is correct, but that begs the question: was that pool properly determined?

In order to answer that question, I must determine whether the requirements were waived for legitimate non-discriminatory reasons. *McDonnell Douglas, supra.* In 1973 it was not economically practical to increase the size of the maintenance department, and hiring apprentices from outside would have increased its size significantly. Tr. 2416, 2427. More importantly, the incumbent members of the department already had some practical training and were moderately skilled. Tr. 2416. Therefore, it made good sense to give these employees a chance to join the apprenticeship program at its inception. Their acquired on-the-job skills served as an excellent substitute for the age, test, and education requirements, and the waiver of those requirements in 1973 was therefore legitimate and non-discriminatory. After 1973 the same entrance requirements were applied to all employees, and there was no question of sex discrimination, as Durant's selection in 1974 shows.

Because the waiver of requirements in 1973 was legitimate and non-discriminatory and because the seniority system used to choose from among the qualified applicants was bona fide, plaintiffs' argument that the selection process was discriminatory must be rejected. The master's findings must be supplemented with a specific finding that the waiver was legitimate. Thus supple-

mented, his other findings on the point are adopted.

### E. *Discharge of Probationary Employees*

■ Whenever O–I hires hourly employees, they are automatically placed on probation for thirty days, during which time the company may terminate them for any reason whatsoever. After that thirty day period, the employees may be terminated only in accordance with the provisions of the contract. Plaintiffs allege that the discharge patterns for probationary employees demonstrate bias against women workers. In particular, they charge that far more female than male probationary employees were discharged on the grounds of "job performance" and "lack of work". The master rejected that contention, but plaintiffs claim that he failed to understand the evidence which was tendered. Findings of Fact 47–55, Conclusion of Law 2.

Most of that evidence was statistical. Dr. Lavalle analyzed the employment records of individuals hired between 1970 and 1977 as selectors. Before discussing the evidence of discrimination which he claims to have uncovered, I first note what he failed to find. There was no statistical discrepancy between the number of male and female permanent employees who were terminated. Tr. 334–35. Moreover, there was no statistical discrepancy between the total number of male and female probationary employees who were terminated. Tr. 319–20. A discrepancy appeared only when the reasons for the probationary discharges were examined. When the categories of "job performance" and "lack of work" were combined, many more female than male probationary employees were so discharged. Exhibit P–9.

This attempt to pre-select and combine two apparently unrelated discharge categories casts serious doubt upon the significance of Dr. Lavalle's results, particularly in light of the fact that overall terminations of both permanent and probationary employees display no sex bias. Tr. 321. Moreover, the calculations performed by Dr. La-

valle were themselves somewhat suspect. He classified Roland Wartburg, a discharged male probationary employee, as discharged for absenteeism, although Wartburg's employment record had also listed job performance as a basis for termination. Had Dr. Lavalle placed Wartburg in the "job performance" category, the male-female discharge discrepancy, even with the arbitrarily combined categories, would not have been statistically significant. Tr. 317–18.

Plaintiffs assert that the testimony of Sheila Arnold and Elaine Johnson shows that the combination of categories was proper. Arnold was discharged after 23 days on the job. She testified that she was told her termination was due to lack of work, though her record indicates that it was actually for job performance. Tr. 76. Elaine Johnson, another terminated probationary employee, testified to a similar experience. Tr. 426–30. Even if this testimony is accurate, and the employment records do cast doubt upon it (Exhibit D–9d), these two incidents do not supply a link between the two termination categories significant enough to warrant combining them for statistical purposes. The master was thus correct in holding that plaintiffs failed to prove a prima facie case of sex discrimination with respect to terminations during the probationary period.

### F. *Maternity Leave Policy*

■ Plaintiffs next attack the maternity leave provision of the 1971–74 Production and Maintenance Contract. The attacked provision states:

(a) A woman's absence from work for the birth of her child shall be considered an absence caused by sickness and shall be governed by the same rules. After her return she shall be given credit for service while absent up to a maximum of one year.

(b) She shall be considered able to return to work six (6) months after the birth, unless her physician states in writing that she should stay away longer. If she stays away longer and does not submit a writ-

ten statement, she shall be considered to have quit as of the last day worked. In no case should she be allowed to return sooner than three months following the birth.

(c) How long before the birth she should leave the job will depend on her physical condition and the nature of her job, but all women must leave at least two months before the expected date of the birth. If there is any doubt as to whether a pregnant woman is physically able to be at work, a written statement should be secured from her physician.

Plaintiffs contend that by setting strict deadlines for leaving and returning, thus treating pregnancy differently from other illnesses, this provision violates Title VII.

Josephine Updegraff, the plant nurse, testified that it has always been O–I's practice to defer to the employee's personal physician in determining how long she can continue working during her pregnancy. Many employees have worked beyond the seventh month of pregnancy and returned before the third month after birth. Tr. 2444–45. The evidence failed to show that even one woman was adversely affected by the pregnancy leave provisions of the 1971–74 contract, for those provisions were never enforced. Moreover, the strict deadlines complained of were deleted from the contract in 1974. The master concluded that even if the attacked provisions did not comport with Title VII, plaintiffs still had no claim thereunder because there was no evidence that the deadlines had ever been enforced against or adversely affected anyone in the class. Findings of Fact 58–63, Conclusion of Law 6.

Plaintiffs argue that the master erred because he misinterpreted the burden which they have in a bifurcated trial such as this. Citing *Teamsters v. United States, supra,* they contend that all they need do at this stage of the litigation is prove the existence of a discriminatory policy, and that finding those persons who deserve relief because of the policy should be postponed until the relief stage. Plaintiffs' description of their burden is correct, but the fact is they have failed to prove the existence of a policy. They have been unable to show that anyone was ever affected by the attacked provision, which was never enforced and which ceased to be a part of the collective bargaining agreement six years ago. A provision which was never applied and now cannot be applied to a single individual does not constitute a discriminatory policy. Plaintiffs have failed to meet their burden of proving liability in this area.

G. *Insurance Benefits Policy*

As noted at pp. 717–718, *supra,* the 1971–74 Production and Maintenance Contract provided that if both husband and wife were employed at the New Orleans plant, only the husband could enroll the dependents in the company insurance program. Plaintiffs do not contend that this enrollment provision was itself a violation of Title VII. Rather they contend that this language was a method which the defendants used to apprise female employees of their second-rate status. This contention was discussed and rejected at pp. 716–719, *supra,* and there is no need to repeat the discussion here. See Findings of Fact 64–68.

H. *Overtime and Sunday Pay*

Intervenors admitted during trial that their claim of unequal pay for women performing overtime and Sunday work was weak and sought to amend their complaint to abandon all such allegations. The original plaintiffs contend that this issue was never a part of their case. The master correctly found that there was no evidence to support the equal pay contentions, and that finding is not challenged here. See Findings of Fact 69–71, Conclusion of Law 3.

I. *Working Conditions in the Selecting Department*

In 1974 and 1975 the Selecting Department was plagued with temporary personnel shortages caused by employees who took frequent and excessively long breaks. Because of these shortages defective bottles

were sometimes shipped, and bottles sometimes fell on the floor because there was no one present to pack them. Tr. 2384. In order to remedy this problem the foreman, Coy Simpson, decided to require that employees provide a doctor's certificate to justify their frequent breaks. Several did so, and everyone in the department continued to receive morning, lunch, and afternoon breaks. Tr. 2384–86. The rule which Simpson instituted was an attempt to correct a serious production problem. Sex did not have anything to do with the incident, and the master's findings to that effect are therefore adopted. Findings of Fact 72–75, Conclusion of Law 3.

### J. Union Representation of Women

The master found that the union has fairly represented women in labor-management disputes. Findings of Fact 80–88, Conclusion of Law 3. Although plaintiffs have objected to this finding, they do not discuss the objections in their memorandum, and it is therefore difficult to ascertain in what respects they believe the findings to be in error.

■ The only specific incident complained of during trial was the placement of Harold Johnson in a relatively high-paying hourly position after he was terminated from a management position in February, 1977 as part of a salaried staff reduction. From 1961 until 1970 Johnson had been an hourly employee at the plant. In 1970 he was promoted to foreman, and under the 1970 collective bargaining contract, he was entitled to receive up to five years seniority even while working as a salaried employee. He was therefore able to accrue seniority until April 1, 1974, when a new contract eliminated the provisions which had allowed such accumulation. Exhibit D–7a. When he was terminated from his supervisory position in 1977, the extra seniority he had accumulated between 1970 and 1974 allowed him to qualify for the lehr quality control job in the selecting department in favor of certain female hourly employees. Tr. 2077–78, Exhibit D–9c. Plaintiffs argue that Johnson's placement shows that the union failed to fairly represent its female members. That contention is mistaken, as the master correctly concluded. The Johnson incident was solely one of contractual interpretation and does not implicate Title VII in any way.

■ There were also scattered allegations made at trial that the union failed to represent women adequately in grievance proceedings. Those allegations are not supported by the record. For instance, after Carol Geeck was terminated in 1978, she processed a grievance with union aid. Tr. 717. When O–I refused to allow Glenda Durant to return to work in late 1976 due to an alleged occupational illness, the union helped her process a grievance which eventually went to arbitration, where she lost. While it is true that the union refused to pursue a second grievance filed by Durant when she was terminated in May, 1977, there was no abuse of discretion in that act, for two prior adjudications involving virtually the same facts demonstrated that the second grievance had no chance of success. See pp. 724–726, *infra*. There is no evidence to show that the union failed to represent women fairly and a good deal of evidence to show that it did. I therefore adopt the master's findings which reject this claim.

### K. Harassment of Lucille Stipelcovich

■ Intervenor Lucille Stipelcovich testified that Stephen Wise told her during a telephone conversation in 1977 that she was making a mistake by participating in the suit against the company. Tr. 1293–95. Wise was able to recall the conversation, which concerned Stipelcovich's right to certain disability benefits, but he denies having mentioned the lawsuit to her. In fact, at the time of the conversation Stipelcovich had not intervened, and Wise stated that he had no knowledge that she was planning to do so. Tr. 2100–01. The master found his testimony to be the more credible, and that finding is not clearly erroneous, particularly given the date of the conversation. Findings of Fact 76–77, Conclusion of Law 3.

### L. Harassment of Glenda Durant

 Glenda Durant testified that on two occasions an hourly worker named Emile Smythe verbally harassed her. Tr. 1464–67. Smythe had no supervisory authority and was reprimanded by management after the incidents were reported. Tr. 2409, 2417–18. The master correctly concluded, and plaintiffs do not dispute, that these incidents are insufficient to prove that the defendants harassed Durant in violation of Title VII. See *Dickerson v. United States Steel Corp.*, 439 F.Supp. 55 (W.D. Pa.1977). Findings of Fact 89–91, Conclusions of Law 3 and 4.

### M. Discharge of Glenda Durant

 When her suit was filed on October 5, 1976, Glenda Durant was on leave from her job due to an alleged occupational back injury. Although she continued to suffer pain from her injury, Dr. Applebaum, her personal physician, told her she could return to work at the beginning of November. However, when she attempted to do so on November 1, 1976, Dr. Incaprera, the plant physician, refused to authorize her return, for he determined that she was physically incapable of performing her duties as a selector. He based his determination upon her history of medical absences, her continual complaints of pain over the past months while performing the selecting job, the least strenuous job in the plant, and the opinion of her own doctor that she would probably continue to experience pain. Tr. 1868–76, 1981–85. Dr. Incaprera reported his determination to Roger Hatch, the Industrial Relations Director, who immediately suspended her from employment. Tr. 2330–32. At the time Dr. Incaprera was unaware of the pendency of this lawsuit. Tr. 1877.

Durant then filed a grievance alleging that her suspension violated the collective bargaining agreement. Alleging that she had been suspended in retaliation for filing this suit, she also moved for a preliminary injunction in this lawsuit to force the company to allow her to return to work. Arbitrator J. Fred Holly rejected her grievance on May 5, 1977, finding that her frequent absences beginning on September 16, 1975 (approximately 11 of 14 months from September, 1975 through October, 1976) and her continual complaints of pain rendered her incapable of performing any job duties at the plant. Exhibit D–13a. I reached a similar conclusion on April 18, 1977 after a hearing on the Motion for Preliminary Injunction:

> Now there simply isn't any evidence supporting plaintiff's charge that she was terminated because she filed suit against the company. There just isn't any.
>
> On the other hand, there is overwhelming evidence that the plaintiff was indeed unable to work without pain at the job which was assigned to her. She had to leave her job on several occasions for lengthy periods of time because of back problems. Almost eleven months out of twelve months.
>
> The company is not obligated to employ a person who is unable to do the required work. I find that the plaintiff was not terminated because of a suit against the defendant and the plaintiffs' claim for an injunction is entirely without merit.

See Finding of Fact 98.[12]

On May 19, 1977, following these two decisions regarding the suspension, Stephen Wise terminated Durant, who contends that this termination was retaliatory. She argues that many other employees at O–I with bad absentee records have not been disciplined, thus demonstrating that the medical reasons advanced by the company for her termination were pretexts for discrimination. However, as shown by Wise's testimony, many of these employees had missed work only for one or two periods of major surgery unlike Durant, who had a series of shorter absences resulting from injuries incurred while performing the nor-

---

12. I further found that the Motion for Preliminary Injunction was so patently groundless that I awarded O–I $1,000 in attorney's fees pursuant to § 706(k) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(k). See *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978).

mal requirements of her job. Other employees mentioned by Durant had no action taken against them because their applications for permanent and total disability benefits were pending. A few others had been warned of disciplinary action if their frequent absences continued. Tr. 2089–99. The evidence cited by Durant is weak and fails to demonstrate that she was selected for special treatment because of the pendency of this suit. She was discharged because her medical condition rendered her unable to do any job at the plant. The master's findings to this effect are correct and I therefore adopt them. Findings of Fact 92–100, Conclusion of Law 3.

### N. *Carol Geeck Discharge*

■ Carol Geeck, the other named plaintiff in the original class action, was discharged on January 31, 1978. She also contends that her discharge was retaliatory. The master rejected this contention, finding that her discharge was based upon her inability to perform her job without sustaining injury. Findings of Fact 101–110, Conclusion of Law 3. The evidence adduced at trial supports his findings, which I therefore adopt.

From January, 1975 until January, 1978 Carol Geeck missed 421 days of work, of which 246 were for alleged occupational injuries incurred on ten separate occasions. On seven of those occasions there had been no accident, but rather Geeck had suffered injury while performing the ordinary duties of the selector's job, the least strenuous in the plant. Tr. 676–84, 2084–85, 2334–35, Exhibit D–12b. Upon her termination she filed a grievance, which was rejected by arbitrator Marlin Volz. He determined, as the master subsequently did, that Geeck's attendance record and medical history demonstrated that she was unable to perform her job with satisfactory attendance. Exhibit D–13B. Geeck responds, as does Durant, that other employees at the plant with similar records have not been disciplined.

**13.** The master denied the intervenors' motion to amend their complaint to withdraw the equal pay claim.

However, as discussed above, this evidence is weak and does not overcome the mass of evidence supporting her discharge.

*Attorney's Fees*

■ A prevailing defendant may recover fees in a Title VII case only if the plaintiffs' claim was frivolous, unreasonable, or groundless, or if the plaintiffs continued to litigate after it clearly became so. *Christianburg Garment Co. v. EEOC*, 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978). The master recommended that defendants be denied fees because the suits were not "unreasonable, frivolous, meritless, or vexatious when filed." Finding of Fact 111, Conclusion of Law 7. Owens-Illinois contends that this recommendation is in error and should be rejected.

■ Most of the claims brought by plaintiffs were reasonable. For instance, the allegations regarding entry-level hiring, while ultimately rejected, were supported by strong statistical evidence. The attack on O–I's failure to promote hourly female employees to supervisory positions at the New Orleans plant was hardly frivolous given the similarities of this case to *Rowe* and *Parson*. Of all the claims brought against the defendants, only the equal pay issue might be considered frivolous, particularly in light of the admission of intervenors' attorney that her evidence on that point was "weak". However, she did attempt to withdraw the claim once she made that determination and did not continue to litigate the claim after it had clearly become unreasonable.[13] Moreover, the original plaintiffs never adopted the intervenors' equal pay issue as their own. I therefore follow the master's recommendation and decline to assess attorney's fees against the plaintiffs.

IT IS ORDERED that plaintiffs' Motion to Reject Special Master's Finding and Recommendation is DENIED. Judgment shall be entered accordingly.