Mary R. CHRISNER, Plaintiff-Appellee,

v.

COMPLETE AUTO TRANSIT, INC.,
Defendant-Appellant.

No. 78–1337.

United States Court of Appeals,
Sixth Circuit.

Argued June 19, 1980.

Decided March 19, 1981.

A. Read Cone, Matheson, Bieneman, Parr, Schuler & Ewald, Bloomfield Hills, Mich., Frank H. Stewart, Roger A. Weber, John Campion, Taft, Stettinius & Hollister, Cincinnati, Ohio, for defendant-appellant.

Ronald Egnor, Egnor, Hamilton & Muth, Ypsilanti, Mich., for plaintiff-appellee.

Before KEITH and MERRITT, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.

CELEBREZZE, Senior Circuit Judge.

Complete Auto Transit appeals from a judgment finding it in violation of Sec. 703(a)(2) of Title VII of the 1964 Civil Rights Act, 42 U.S.C. Sec. 2000e *et seq.* The district court held Complete Auto responsible for illegal sex discrimination against plaintiff Mary Chrisner when it failed to hire her for a position as yard employee. It ruled that Complete Auto's hiring policies concerning truck-driving yard employees were violative of Title VII.

The action was brought against Complete Auto Transit by Ms. Mary Chrisner in the United States District Court for the Eastern District of Michigan. Complete Auto is a Michigan corporation engaged in the business of transporting new automobiles by tractor-trailer combinations from the point of manufacture to dealers across the country. To facilitate the transfer of the new automobiles, Complete Auto operates terminals throughout the nation. Only its Willow Run terminal in Ypsilanti, Michigan is involved in the present case.

The Willow Run Terminal is adjacent to a General Motors automobile manufacturing plant. As new cars come off the G.M. assembly lines, the vehicles are driven to Complete Auto's terminal, where yard employees working on the "release gate crew" receive and inspect the vehicles, assign them special identification numbers, and transport them to a yard marshalling area. The new vehicles are subsequently taken to a dock area and loaded onto large tractor-trailer combinations. These trucks then deliver the automobiles, and after completing delivery, the standard operating procedure is for the driver to deposit his empty tractor-trailer in the terminal yard for reloading. The volume is sufficiently great that as many as eight empty trucks can accumulate before the beginning of the first shift. In order for loading operations to commence in an orderly fashion, the trucks must be jockeyed about the yard and, when necessary, driven to an overflow lot. Rearranging the trucks in the yard and driving them to the overflow lot is an important, albeit minor, responsibility of the yard employees.

In 1973, General Motors increased production at the plants served by the Willow Run terminal to an extent that Complete Auto's existent facilities were unable to accommodate the stepped-up production. In an attempt to handle the overflow, Complete Auto acquired space at the Willow Run Airport, which is, using the public highways, about one mile from the terminal. The acquisition of space at the airport meant that yard employees would have to transport the tractor-trailers from the terminal to the overflow lot using public highways. When operations were confined to the terminal the driving of the large trucks by yard employees was also restricted to that area.

In response to this change in operating procedure, as well as union pressure regarding periodic layoffs of yard employees who could not be transferred to a truck driving position because they were not qualified,

Complete Auto implemented a new hiring requirement for yard employees: to merit consideration a prospective yard employee needed to have two years of truck driving experience or have completed a course of study at a truck driving school. These prerequisites were not retroactively imposed on employees working in the yard in 1973 because provisions in the collective bargaining agreement would not allow such a change.

On February 11, 1976, Mary Chrisner applied for a position as a yard employee at the Willow Run terminal. She had not attended or completed truck driving school and did not have the requisite two years of truck driving experience. Complete Auto rejected Chrisner's application because she failed to meet either job requirement.[1]

In August, 1976, the Willow Run terminal experienced a wildcat strike by an estimated 80 or 90 employees. Economic pressures generated by this wildcat strike forced Complete Auto to abandon temporarily its policy of requiring applicants to possess either two years experience or appropriate schooling in order to gain employment as a yard employee. The company decided that it would, during the duration of the strike, train the employees in the operation of tractor-trailers. Nine new persons, including Ms. Chrisner, were hired to work in the yard during the strike. Ms. Chrisner's employment, together with that of seven other temporary employees, was terminated at the end of the strike. The remaining temporary employee was released one week later.

After the strike had ended the company did not revert to the more stringent qualifications for yard employees. Instead, Complete Auto required only a chauffeur's license and a physical examination. If necessary, new yard employees received on-the-job training from the company to drive the tractor-trailers.

In April, 1977, Ms. Chrisner filed the present action alleging that Complete Auto's initial refusal to hire her for the job of yard employee was a decision based solely on her gender. After a trial before a United States Magistrate, the District Court examined the record and concluded that the plaintiff had established a prima facie case of disparate impact discrimination and that the defendant had not successfully rebutted that case by establishing a business necessity defense. Specifically, the district court found that the two year experience requirement acted as a "grandfather clause" in perpetuating the exclusion of females from the trucking industry. The court also concluded that alternatives were available to Complete Auto which would have accomplished Complete Auto's stated goals while minimizing the discriminatory impact of its job requirements. In its final judgment order, the court ordered Complete Auto to pay Ms. Chrisner $35,742.18 in back pay, $6,000.00 in attorneys' fees and costs of $417.62; Complete Auto was also ordered to cease discriminatory action against Ms. Chrisner, to offer her a job as a yard employee with retroactive seniority and all fringe benefits according to a seniority date of April 28, 1976.

## I.

The ultimate goal of Title VII is the elimination of "discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800, 93 S.Ct. 1817, 1823, 36 L.Ed.2d 668 (1973). The same goal is equally applicable to sex discrimination. *Dothard v. Rawlinson*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977). In enacting Title VII, Congress required "the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification." *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971).

Title VII cases comprise a tripartite life cycle. The initial burden on a Title VII

---

1. The parties stipulated that the sole basis for the rejection of plaintiff's job application was the fact that she failed to have either prerequisite required by Complete Auto.

plaintiff is to establish a prima facie case of employment discrimination. The burden then shifts to the defendant to prove or demonstrate a defense to the apparent discrimination. If the defendant successfully rebuts the prima facie case, the burden then shifts back to the plaintiff to show that there are alternative available selection devices without similar discriminatory effect which would also serve the employer's legitimate interest in efficient and trustworthy workmanship.

▪ Under the current law surrounding Title VII, two separate but related theories are available to prove a prima facie case of employment discrimination: disparate impact and disparate treatment. "Disparate treatment ... is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment. Undoubtedly, disparate treatment was the most obvious evil Congress had in mind when it enacted Title VII." *Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396. Claims of disparate treatment may be distinguished from claims that stress disparate impact. Disparate impact cases involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity. Proof of discriminatory motive, the Supreme Court has held, is not required under a disparate impact theory. Compare *Griggs, supra*, 401 U.S. at 430–32, 91 S.Ct. at 853–54 with *McDonnell Douglas, supra*, 411 U.S. at 802–806, 93 S.Ct. at 1824–1826. Either theory may, of course, be applied to a particular set of facts. *Teamsters v. United States*, 431 U.S. at 335–36, n. 15, 97 S.Ct. at 1854–55 n. 15.

▪ Central to both theories of liability where sex discrimination is alleged is the existence of an identifiable employment practice or policy that demonstrably affects all members of a class in a substantially similar, if not an identical manner. In disparate treatment cases, this is the pattern or practice followed as an employer's regular or standard operating procedure which treats women in relatively unfavorable ways so that it justifies a rebuttable inference that it proceeds from an intention to treat them differently simply because of their sex. *See Teamsters, supra*, at 336, 97 S.Ct. at 1855. In disparate impact cases, it is the practice or policy which, although theoretically neutral or benign in a sex related context, nevertheless has a disproportionate adverse impact upon females without any justification of business necessity. Disparate impact analysis is properly applied where the discrimination results not from the decision to employ a challenged practice, but from its effect. In the instant case the plaintiff does not challenge Complete Auto's decision implementing the schooling or experience requirements. Rather, the focus is on the effect of those hiring requirements.

▪ The thrust of the claim that the two year experience or schooling requirements discriminate against women does not involve an assertion of purposeful discriminatory motive. What Ms. Chrisner does contend is that these facially neutral prerequisites operate disproportionately to exclude women from eligibility for employment as yard employees with Complete Auto. To establish a prima facie case, she need only show that these employment standards select applicants for hire in a significantly discriminatory pattern. *Dothard, supra*, 433 U.S. at 329, 97 S.Ct. at 2726; *Griggs, supra*, 401 U.S. at 432, 91 S.Ct. at 854.[2] *See also New York City*

2. The correct focus is on the aggregate impact of the combined qualifications. *Smith v. Troyan*, 520 F.2d 492, 498 (6th Cir. 1975), *cert. denied*, 426 U.S. 934, 96 S.Ct. 2646, 49 L.Ed.2d 385 (1976). Of course, the plaintiff does not

have to show a disparate character in both aspects of the job selection scheme in order to demonstrate that the overall policy had a disparate impact on women. For instance, if the company selected roughly equal numbers of

*Transit Authority v. Beazer*, 440 U.S. 568, 584, 99 S.Ct. 1355, 1365, 59 L.Ed.2d 587 (1979).

The evidence in the record indicated that a study by the American Trucking Association based on 1970 Census data showed that only one half of one percent (.5%) of all truck drivers were female.[3] In considering the effect of the two year experience requirement, the district court concluded that it served to perpetuate the exclusion of females from the trucking industry. The proper focus when determining impact is on those excluded by the requirement. *Payne v. Travenol Laboratories, Inc.*, 565 F.2d 895, 899 (5th Cir. 1978).[4] The experience requirement automatically disqualifies all people who have not accumulated two years of experience driving a truck, a vast majority of whom would be females given their gross underrepresentation in the trucking industry when the experience requirement was implemented in 1973. Complete Auto's representative testified that the company's statistics for female employment paralleled the national figures, noting that he could recollect Complete Auto's non-office females because they were "unique," meaning few and far between.

Complete Auto argues that a showing of scant participation by women in the trucking industry based on generalized national statistics does not establish a prima facie case of the two year experience requirement's disproportionate impact on women. In particular, it points to Chrisner's failure to adduce statistics as to how many or what percentage of females could not have satisfied this qualification, or as to what percentage of males were excluded from employment in the yard based on this requirement. *See Hazelwood School District v. U. S.*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977). In *Hazelwood*, the Supreme Court approved the use of comparative statistics showing a narrow labor pool defined by those qualified for employment to particular jobs available. The Court explained that "when special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value." 433 U.S. at 309 n. 13, 97 S.Ct. at 2742 n. 13. On the other hand, where the job skills in question are the kind that "many persons possess or can fairly readily acquire," general population data has proved acceptable. *Hazelwood, supra*, at 308 n. 13, 97 S.Ct. at 2742 n. 13. *See also Teamsters, supra.* Indeed, in

---

applicants from the "experience pool" and the "school pool," and the "experience pool" were made up of a disproportionately large number of men, then the "school pool" would have to be disproportionately female in order for the policy as a whole not to have disparate impact. Here, the Magistrate found that the disparate effect of the experience requirement was only "partly tempered by the alternative requirement that a person with a certificate from a truck driving school would also be considered for employment." Therefore, the Magistrate found that the company's selection policy overall had a disparate effect, because there was no reason to believe the "school pool" was disproportionately female.

3. "Evidence of longlasting and gross disparity between the composition of a work force and that of the general population thus may be significant even though Sec. 703(j) makes clear that Title VII imposes no requirement that a work force mirror the general population." *Teamsters, supra*, 431 U.S. at 339–40 n. 20, 97 S.Ct. at 1856–57 n. 20.

Complete Auto complains that the vitality of the 1970 statistic was sapped by the passage of time, rendering that figure too unreliable for use in a prima facie case. While we have some second thoughts about the use of employment information which was eight years old at the time of trial, particularly in view of the *profound changes in society's attitudes and practices during the 1970's*, we think the evidence, given the *gross disparity*, was sufficiently probative so as to allow its use here.

4. The EEOC's Uniform Guidelines on Employee Selection Procedures (1978) indicate that a selection rate for any identifiable group i.e. (women) which is less than four fifths (80%) of the group with the highest rate (men) will generally be regarded as evidence of adverse impact. 29 C.F.R. Sec. 1607.4(D). For a valuable discussion of these guidelines, *see Guardians Assn. v. Civil Service Comm.*, 630 F.2d 79, 90–106 (2d Cir. 1980).

*Hazelwood* the Court noted that truck driving, the skill in question in *Teamsters* and here, was one readily acquired, and therefore the use of general population data was acceptable.[5] Accordingly, a prima facie case may be established without evidence of qualifications where the inference of discrimination is supported by a compelling level of female underrepresentation in a sizeable work force. *See e. g., Fisher v. Procter & Gamble Mfg. Co.*, 613 F.2d 527, 544 (5th Cir. 1980).[6] Statistics concerning low female participation in an industry may be relied upon to show unequal access to that industry. In setting up a prima facie case, Chrisner was not required to provide statistical figures as to the percentage of applicants, male and female, which would be automatically disqualified by the two year experience requirement in light of the alternative statistical evidence presented. The 1970 statistical imbalance between male and female participation in the industry is sufficiently probative to allow an inference that a substantially greater percentage of females would not be able to meet the experience criterion. It was for the district court in the first instance to determine whether these statistics permitted an inference as to whether the experience requirement had a disparate impact on females.[7] Although the district court's inference was not compelled by the data presented by the plaintiff, we are unable to conclude that its finding in this respect was clearly erroneous. *See e. g. Marsh v. Eaton Corp.*, 639 F.2d 328 (6th Cir. 1981). Com-

plete Auto was free to present evidence that its entry level hiring policy was not a distinctive circumstance supporting the inference of discrimination. It did not offer such countervailing evidence. Under the "clearly erroneous" standard of review, we see no basis for disturbing the district court's factual findings which led to the conclusion that the two year experience requirement had a discriminatory impact on female applicants.

## II.

■■■■ We now turn to the appellant's contention that the challenged hiring practices are founded upon business necessity. To justify its hiring requirements as a business necessity, Complete Auto must show that its practices bear a manifest relationship to the yard workers' employment— that the practices are related to their job performance. *Dothard, supra*, 433 U.S. at 329, 97 S.Ct. at 2726, *quoting Griggs, supra*, 401 U.S. at 432, 91 S.Ct. at 854; *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975); *McDonnell Douglas, supra*, 411 U.S. at 801, 93 S.Ct. at 1823; *Horace v. City of Pontiac*, 624 F.2d 765, 768 (6th Cir. 1980). If the job related qualifications are bona fide, they may "measure the person for the job and not the person in the abstract. *Dothard, supra*, 433 U.S. at 332, 97 S.Ct. at 2728 quoting *Griggs, supra*, 401 U.S. at 436, 91 S.Ct. at 856.

---

5. Where the existence of necessary qualifications is not readily apparent, the burden is on the defendant to demonstrate that "the positions do in fact require special qualifications not possessed or readily acquired by the general population." *EEOC v. Radiator Specialty Corp.*, 610 F.2d 178, 185 (4th Cir. 1979); *Kaplan v. International Alliance of Theatrical and Stage Employees*, 525 F.2d 1354, 1358 n. 1 (9th Cir. 1975); *United States v. Hayes International Corp.*, 456 F.2d 112, 120 (5th Cir. 1972).

6. *Cf. Greenspan v. Automobile Club of Michigan*, 495 F.Supp. 1021 (E.D.Mich.1980) (employer that has disproportionately low number of female employees in professional, technical, and sales job violated Title VII by, among other things, reliance on unvalidated job require-

ments, including requirement of experience in jobs open recently only to men, by absence of systematic job description and evaluation system, and by policy of vesting managers with large degree of unsupervised discretion in matters of personnel selection); *Thompson v. Boyle*, 499 F.Supp. 1147 (D.D.C.1980) (court rejects argument that statistics concerning low female participation in bookbinder program may not be relied upon to show unequal access to the program).

7. Statistical evidence may establish a prima facie case of employment discrimination in an individual action as well as in a class action. *Davis v. Califano*, 613 F.2d 957, 962–63 (D.C. Cir. 1980).

A close reading of the record reveals that the district court misconceived the nature of the business necessity defense and the corresponding quantum of proof necessary to corroborate that defense. The court below stated:

"Now, certainly it is not the function of the court to suggest or to minimize the suggestion that anyone who takes a truck out on the public highway ought to be completely qualified and bear in mind the economic impact of the company as a result of accidents and so forth that the company would be entitled to say we don't want our trucks taken out on the highway without there being a qualified driver at the wheel is certainly a compelling business necessity. However, in terms of this case, I don't find that there was a compelling business necessity as that term is described in *Duke Power* and the other cases that would override this otherwise neutral and otherwise appropriate company requirement . . . so there is a disparate impact and the requirement in my opinion does not—is not for a sufficient compelling reason. There were alternatives available to the company . . ."

In other words, the District Judge rejected Complete Auto's business necessity defense solely because he believed that the company had not shown the unavailability of alternative hiring procedures which would have less of an adverse impact on female applicants. This truncated analysis misconstrues the shifting burdens of employment discrimination law. In disparate impact cases, a Title VII defendant does not bear the burden of showing that its practice or policy embodies the concept of least discriminating alternative. Complete Auto should not have been compelled to disprove the existence of feasible, alternative methods for hiring yard employees. To the contrary, Ms. Chrisner bears the burden of affirmatively proving the existence of an alternative with a lesser disparate impact. The district court's analysis unjustifiably collapsed the three-step test employed in *Griggs* into a two-step examination in which the defendant, in order to successfully establish a business necessity defense, was burdened with proving to the court's satisfaction that its hiring requirements would have the least disparate impact of all conceivable requirements which satisfactorily measure applicants for employment. By placing too great of a burden on the defendant, this analysis renders the third step of the Title VII inquiry superfluous.[8] The correct approach requires that the de-

---

**8.** In *Board of Trustees v. Sweeney*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978), the Supreme Court vacated and remanded the First Circuit's decision in a disparate treatment case because it appeared that the Court of Appeals had imposed a heavier burden on the employer than *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978) required with respect to meeting the employee's prima facie case of discrimination. Although the Court of Appeal's analysis was unclear, it apparently had burdened the employer with proving the absence of a discriminatory motive instead of simply requiring the articulation of some legitimate, non-discriminatory reason for the employee's rejection. This construction was erroneous because it made superfluous the third step in the *Furnco-McDonnell Douglas* analysis; it would place on the employer at the second stage the burden of showing that the reason for rejection was not a pretext, rather than requiring such proof from the employee as a part of the third step. Because these burdens of proof are distinctly different, *Sweeney, supra,* at 25, the Supreme Court believed it necessary to remand the case for reconsideration in light of *Furnco. See also*

*Texas Dept. of Community Affairs v. Burdine,* —— U.S. ——, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

*Sweeney* suggests that a remand for reconsideration of Complete Auto's business necessity defense might be appropriate because the district court condensed the relevant three stage analysis into two steps and went awry by imposing the burden on the employer to *disprove* the existence of an available alternative instead of requiring the plaintiff to *prove* such an option was within reach. That error, however, belies the necessity for a remand on this point. The district court specifically found that having "a qualified driver at the wheel is certainly a compelling business necessity," and that but for the availability of a policy with less of a disparate impact, the experience prerequisite was an "otherwise neutral and otherwise appropriate company requirement." These findings persuade us that the district court found the company's hiring policy was manifestly related to the job requirements. On the record before us we cannot characterize these findings as erroneous. And the failure of the trial judge to couch his findings in the precise

fendant attempt to rebut the prima facie case of employment discrimination by showing that its hiring policy is "manifestly related" to the job requirements. If the manifest relation is shown, then the business necessity defense is complete and the burden then shifts to the plaintiff to show that there are alternative selection devices without a similar discriminatory effect which would also serve the legitimate needs of the employer.

Misunderstanding of this bifurcated approach may well be engendered by the appellation of the defense itself. Literally construed, it would not be unreasonable to conclude that proof of a "business necessity" defense requires a showing that the practice is absolutely necessary or inherently essential to the operation of the business.[9] Such a standard, however, would direct unwarranted strict scrutiny at the defendant's asserted justifications and has

language of *Griggs* does not necessitate a remand. *See James v. Newspaper Agency Corp.*, 591 F.2d 579, 583 (10th Cir. 1979).

9. For example, in requiring that there exist more than a business purpose for adhering to a practice, courts have demanded the presence of an overriding and compelling business purpose. *Kirby v. Colony Furn. Co.*, 613 F.2d 696 (8th Cir. 1980) ("The proper standard is ... whether there is a *compelling* need for the employer to maintain that practice and whether the employer can prove there is *no* alternative to the challenged practice."); *Parson v. Kaiser Aluminum & Chemical Corp.*, 575 F.2d 1374, 1389 (5th Cir. 1978). *Head v. Timken·Roller Bearing Co.*, 486 F.2d 870, 879 (6th Cir. 1973). *Campbell v. Ramsey*, 484 F.Supp. 190, 194 (E.D.Ark. 1980). The genesis of this approach appears to be *Robinson v. Lorillard Co.*, 444 F.2d 791, 798 (4th Cir.), *cert. dismissed* 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971).

The dissent argues that the force of *Sweeney, supra*, necessitates a remand because the district court did not make the requisite findings on the business necessity defense when it condensed the Title VII analysis into two steps. Nevertheless, it proceeds to assert that under *Head v. Timken Roller Bearing, supra*, the employer has not established a business necessity defense because the company subsequently used alternative selection devices. The dissent concedes the flaw in its analysis by ignoring the full force of *Sweeney*. Decided by the Supreme Court five years after *Head*, *Sweeney* stands for the proposition that the three-part Title VII analysis cannot properly be conducted in only two stages. The dissent's approach, which compels an employer to prove a business necessity defense by showing that there exist no less discriminatory alternatives, is, in essence, a two-stage analysis since it renders the third step superfluous. If an employer does prove a business necessity defense, that is, there are no alternative policies with a lesser discriminatory impact, a plaintiff would thereby be precluded from attempting to show that there are available alternatives—the crucial third stage of Title VII analysis. *Griggs* does not countenance denying a plaintiff the opportunity to rebut a business necessity defense under any circumstances, but that is precisely

the result invited by the dissent's approach. An equally unsatisfactory result accrues when the other possibility is considered. If an employer does not prove the absence of alternative policies, that would be the equivalent of affirmatively establishing that there are, in fact, viable alternatives. The burden of establishing the presence of available alternatives, however, belongs only to the plaintiff and must be sustained in the third stage of the analysis. Such an erroneous allocation of the burden of proof is exactly the practice rejected by *Sweeney*.

This illustrates the dilemma the dissent puts itself in by arguing that a remand is necessary under *Sweeney* because the trial court collapsed the three step inquiry into two steps, and at the same time relying on *Head v. Timken Roller Bearing* which commands a two-step analysis. The dissent omits the full language of *Head*, which reads:

> The court's error arose from its failure to take into account one necessary element of the test. *The test consists of two discrete parts* as set forth in *Robinson v. Lorillard Co.*, 444 F.2d at 798:
>
> The test is whether there exists an overriding legitimate business purpose such that the practice is necessary to the safe and efficient operation of the business. Thus, the business purpose must be sufficiently compelling to override any racial impact; the challenged practice must effectively carry out the business purpose it is alleged to serve; and *there must be available no acceptable alternative policies or practices* which would better accomplish the business purpose advanced, or accomplish it equally well with a lesser differential racial impact. (emphasis added).

Insofar as any two-part test is inconsistent with the three-part analysis outlined in *Griggs* and *McDonnell Douglas* and reinforced by *Sweeney*, it must be discarded.

The dissent's insistence that *Head* has been "consistently followed" cannot withstand the scrutiny of closer analysis. In *Horace v. City of Pontiac, supra*, this court did not cite *Head*, but rather quoted the three part test of *Griggs* and *McDonnell Douglas*. The only reference to *Head* appears in a block quote of the district court's opinion. 624 F.2d at 768. In *Mitchell*

not been adopted by the Supreme Court. The proper test, as we see it, is the "manifest relationship" test enunciated in *Griggs* and its progeny which looks to whether the discriminatory employment practice is necessary to safe and efficient job performance. *Dothard, supra*, 433 U.S. at 332 n. 14, 97 S.Ct. at 2728 n. 14. For a practice to be "necessary" however, it need not be the *sine qua non* of job performance; indispensability is not the touchstone. Rather, the practice must substantially promote the proficient operation of the business.

Application of the business necessity defense entails considerations which are a function of the job's demands. In this regard, positions can be evaluated according to their location on the type of spectrum described in *Spurlock v. United Airlines*, 475 F.2d 216, 219 (10th Cir. 1972):

> When a job requires a small amount of skill and training and the consequences of hiring an unqualified applicant are insignificant, the courts should examine closely any pre-employment standard or criteria which discriminates against minorities. In such a case, the employer should have a heavy burden to demonstrate to the court's satisfaction that his employment criteria are job related. On the other hand, when the job clearly requires a high degree of skill and the economic and human risks involved in hiring an unqualified applicant are great, the employer bears a correspondingly lighter burden to show that his employment criteria are job related.

In *Spurlock*, the Tenth Circuit agreed with United's contention that 500 hours of flight time was a reasonable minimum requirement to insure that applicants passed the flight officer training program. Since a flight officer is ultimately responsible for the safety of passengers as well as costly aircraft, the public interest is paramount, justifying high employment standards. An industry with the primary function of managing the safety of large numbers of passengers must be allowed more latitude in structuring the requirements which could effect the performance of a primary business objective. *See Burwell v. Eastern Airlines*, 633 F.2d 361 (4th Cir. 1980) (en banc). At the other end of the spectrum, where considerations of public safety are negligible, employment standards are appropriately less demanding. For example, requirements of sales experience and sales motivation for entry into a securities sales representative training program failed to satisfy the business necessity standard. *Kinsey v. First Regional Securities, Inc.*, 557 F.2d 830, 837 (D.C.Cir. 1977).

Complete Auto argues that its experience/schooling criteria were reasonable minimum requirements to insure that yard employees were qualified to operate tractor trailers on the public highways in a safe and efficient manner. The yard employees are called upon to drive tractor-trailers to the overflow lot over the public highways. The performance of this task in a satisfactory manner requires a certain degree of skill in operating the tractor-trailers. The company's goal of transporting its freight in a safe and efficient manner is significantly served by hiring experienced truck operators. An individual who possesses experience in driving large, unwieldy vehicles

---

*v. Mid-Continent Spring Co.*, 583 F.2d 275 (6th Cir. 1978), *Head* was cited only for the proposition that females must have equal employment opportunities. 583 F.2d at 281. In *EEOC v. New York Times Broadcasting Service, Inc.*, 542 F.2d 356 (6th Cir. 1976), *Head's* two-step process was, in fact, followed. 542 F.2d at 361. That was not true, however, in *EEOC v. Detroit Edison Co.*, 515 F.2d 301 (6th Cir. 1975), where the court relied on *Head* solely for the principle that when a seniority system locks a minority of black employees into low opportunity areas of work, while protecting the status of those of the majority, it must give way. 515 F.2d at

313. And in *Palmer v. General Mills, Inc.*, 513 F.2d 1040 (6th Cir. 1975), the court divided *Head's* second step into three sub-parts, holding that the essential finding was that the seniority practice at issue was not of compelling importance to the company's business, that whether the practice effectively carried out a business purpose was irrelevant because the challenge was directed at a facially neutral policy, and that the availability of alternatives was pertinent only to the remedy, not to liability. 513 F.2d at 1044. This "long line of subsequent decisions" hardly constitutes a litany of faithful adherence to *Head* as suggested by the dissent.

is obviously a more rational choice for the job than is a person who does not have demonstrated ability to drive such vehicles. In this respect, the experience requirement accurately reflects the capacity of an applicant to do the job for which he is applying. There is some risk to the public safety, as well as to the driver and truck, in the employment of an unqualified yard employee. The important public interest in safety on the roads and highways, *see Mackey v. Montrym*, 443 U.S. 1, 18, 99 S.Ct. 2612, 2621, 61 L.Ed.2d 321 (1979); *Dixson v. Love*, 431 U.S. 105, 114, 97 S.Ct. 1723, 1728, 52 L.Ed.2d 172 (1977), is sufficiently weighty to convince us that Complete Auto's experience requirement for yard employees is manifestly related to the safe and efficient operation of its business of transporting automobiles over the public highways.

### III.

Once the defendant in a Title VII disparate impact case has rebutted the plaintiff's prima facie case by proving a business necessity defense to the challenged practice, the burden shifts back to the plaintiff. To establish liability at this point, the plaintiff must demonstrate that there is an alternative selection device with a disparate impact less than that of the challenged practice which would still serve the employer's legitimate interests in efficiency and trustworthy workmanship. *Griggs, supra*, 401 U.S. at 432, 91 S.Ct. at 854; *Albemarle, supra*, 422 U.S. at 425, 95 S.Ct. at 2375. Because the district court

failed to consider this as a separate stage in the analytical framework of the case, we remand the case for the court to conduct a hearing on this issue. In determining whether the plaintiff has sustained her burden in proving the existence of a viable alternative hiring procedure, the court should consider evidence that the plaintiff might introduce on a variety of factors. Certainly any subsequent practices adopted by the company would be relevant. The hiring policies of comparable businesses might also shed some light on what constitutes a feasible alternative. Of course, the marginal cost of another hiring policy and its implications for public safety are factors which should not be omitted from consideration. In any event, the initial determination must rest with the trial court.[10]

The decision of the district court is affirmed in part and vacated and remanded in part.

KEITH, Circuit Judge, concurring in part and dissenting in part.

I join Parts I and III of the court's decision, but I am unable to join Part II for two reasons: first, the majority misconstrues language in the trial court opinion, and second, the majority applies a legal standard which is contrary to Sixth Circuit precedent.

### A.

In Part II, the majority examines the concept of business necessity under *Griggs*

---

10. Complete Auto relies on the recent decision in *Furnco, supra*, for the proposition that courts should not restructure business practices unless mandated by Congress to do so. The Supreme Court stated with regard to the employer's burden for articulating a legitimate non-discriminatory reason for the rejection of the plaintiff, that "to prove that, he need not prove that he pursued the course which would both enable him to achieve his own business goal *and* allow him to consider the most employment applications. Title VII prohibits him from having as a goal a work force selected by any proscribed discriminatory practice, but it does not impose a duty to adopt a hiring procedure that maximizes hiring of minority employees." 438 U.S. at 577–78, 98 S.Ct. at 2949–50. The inquiry is not terminated, however, by the

demonstration of such a legitimate non-discriminatory reason. The plaintiff may then show that the proffered justification was merely a pretext for discrimination. The disparate treatment analysis in *Furnco* does imply that the plaintiff cannot establish a "pretext" by showing that alternative procedures for hiring more minorities were available. Thus, in disparate treatment cases it is true that courts should not restructure business practices unless a violation of Title VII is well established. On the other hand, in a disparate impact case a plaintiff may still establish a case of employment discrimination by demonstrating that there were alternative selection devices available that would have less of a disparate impact than the hiring procedures employed by the company.

*v. Duke Power*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Before grappling with this issue, it notes that the trial court below failed to correctly apply both the business necessity and the less discriminatory alternatives concepts—the second and third stages respectively of the *Griggs* analysis. Nevertheless, the majority concludes at footnote eight of the opinion that "[T]he district court specifically found that 'having a qualified driver at the wheel is certainly a compelling business necessity,' and that but for the availability of a policy with less of a disparate impact, the experience prerequisite was an *'otherwise neutral* and *otherwise appropriate* company requirement.' " In my view, the majority misreads the district court. The relevant portion of the district court opinion reads more fully:

> ... in terms of this case, *I don't find that there was a compelling business necessity* as that term is described in *Duke Power* and the other cases that would override this *otherwise neutral* and *otherwise appropriate* company requirement. In other words, the decision of the company in 1973 was not motivated by consideration of discrimination; it was motivated according to the testimony by two factors, one, the idea that the ... yard employees are required or were required to drive these rigs, these trucks over the public highway and also that the company thought, after some discussion with the union, that it would be appropriate to have a system whereby first, prior, or the—for other jobs could be given to company employees in the first place rather than going out on the street and hiring fresh employees. But that requirement in my judgment did not have

disparate effect. It did tend to freeze out the previously excluded ... So there is a disparate impact and that requirement in my opinion does not—is not for a sufficient compelling reason. There were alternatives available to the company. (Emphasis added).

In order to reach the conclusion that the district court made a factual finding of business necessity, the majority interprets the above language as follows: the company's selection device was "otherwise appropriate" absent the existence of "alternatives available to the company." This construction takes the phrase "otherwise appropriate" out of context. The sentences which immediately follow the phrase in the text of the district court opinion discuss disparate impact. They do not discuss available alternatives. They do make clear that the trial court sought to convey only that the selection device was "otherwise appropriate" absent its *disparate impact* upon women. In other words, the trial court merely observed in the opinion that the company's selection device was neutral on its face and that adoption of the device "was not motivated by consideration of discrimination." Therefore it is unreasonable for this court to construe the relevant portion of the trial court opinion as meaning anything other than that there was "no compelling business necessity as the term is used in *Duke Power.*" [1]

It follows then that the majority should not have reviewed the merits of the company's business necessity contention. The majority offers two explanations for its decision to do so: that the district court implicitly found business necessity and, at foot-

---

1. The trial court did state:
   Now certainly it is not the function of the court to suggest or minimize the suggestion that anyone who takes a truck out on the public highway ought to be completely qualified and bear in mind the economic impact of the company as a result of accidents and so forth to the company.
   The majority interprets this language in a manner that would undergird its conclusion that the trial court made a finding of business necessity. However, two points are plainly evident concerning the above language: (1) the

trial court was speaking in general terms and was not specifically referring to the case before it—in fact, the next sentence in the opinion begins "[H]owever, in terms of this case ...," and (2) the trial court never stated that Complete Auto Transit's selective device was the kind of criterion it had in mind in order for a driver to be "completely qualified." If anything, subsequent language in the opinion indicates otherwise. As a result, the language quoted above cannot support the notion that the trial court made a finding of business necessity.

note eight, that "the failure of the trial judge to couch his findings in the precise language of *Griggs* does not necessitate a remand." These explanations do not withstand analysis. First, as I have discussed, a proper reading of the district court opinion reveals that the trial court actually made no such finding of business necessity. Second, we do not have before us the problem of a trial court simply failing to use the precise terminology of *Griggs*, as was the case in *James v. Newspaper Agency Corp.*, 591 F.2d 579, 583 (10th Cir. 1978).[2] The terminology point is a red herring. The real reason this court should have remanded the business necessity issue for reconsideration is that the trial court collapsed the second and third stages of the *Griggs* analysis. Because of this error it is impossible to determine if the district court reasoned properly before making its factual finding as to business necessity.

In a closely analogous situation, the Supreme Court remanded for reconsideration a lower court's finding of Title VII liability. *See Board of Trustees v. Sweeney*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978) (The Court remanded the case because the court of appeals collapsed the second and third stages of the *McDonnell Douglas* Title VII analysis). Under a *Sweeney*-like rationale, this court should have remanded the business necessity issue to the trial court for reconsideration. *See Grano v. Dept. of Development*, 637 F.2d 1073 at 1082 n.8 (6th Cir. 1980); *Sweeney v. Board of Trustees of*

*Keene College*, 604 F.2d 106 (1st Cir. 1979), *cert. denied*, 444 U.S. 1045, 100 S.Ct. 733, 62 L.Ed.2d 731 (1980); *DPOA v. Young*, 608 F.2d 671, 692–98 (6th Cir. 1979) (remanding reverse discrimination case where trial court applied an incorrect legal standard as to the constitutional issues).[3] Instead, the majority went on to "affirm" the district court as to this issue because in its view the "finding" of business necessity was not clearly erroneous.[4] The majority thus affirms a finding that was never made.

### B.

In further support of its ruling, the majority opines that proof of business necessity does not require a showing that the practice is "absolutely necessary or inherently essential to the operation of the business ... For a practice to be 'necessary' ... it need not be the *sine qua non* of a job performance ..." Going further, the majority endorses an approach taken by the Tenth Circuit in *Spurlock v. United Airlines*, 475 F.2d 216 (10th Cir. 1972), and concludes that because of "[T]he important public interest in safety on the roads and highways" the company's hiring requirements were manifestly related to the safe and efficient operation of its business. This analysis of business necessity is contrary to long-established precedent in this circuit.

As the majority correctly observes, the courts of appeals have taken two approaches in providing a description of the

---

**2.** The majority cited *James v. Newspaper Agency Corp.*, *supra*, for support of its decision not to remand the business necessity defense issue. In *James*, the Tenth Circuit held that the district court "substantially followed the guidelines of *McDonnell Douglas v. Green*" and "the fact that the trial judge's findings are not couched in the precise language of *McDonnell Douglas*, *Furnco* and *Rich* does not necessitate a reversal." 591 F.2d at 579. In the instant case, however, the district court used precise *Griggs*-type terminology, *e. g.* "disparate impact," "business necessity," *etc.*, in support of its ruling against the company. Therefore, *James* has no applicability here.

**3.** Moreover, the majority's decision to review the business necessity issue is inconsistent with its decision to remand the less discriminatory alternatives issue for further consideration. Part III of the majority opinion makes

clear that the court remanded the less discriminatory alternatives issue because the district court consolidated the second and third stages of the *Griggs* equation. It is my view that the business necessity issue should have been handled the same way. The district court should have been ordered to reconsider the business necessity issue, and to reconsider the less discriminatory alternatives issue if it found that the company made out a business necessity defense.

**4.** In an ironic twist, the company, which had the burden on appeal of showing that the district court's refusal to find business necessity was in clear error, now finds itself the beneficiary of the "clearly erroneous" standard of review by virtue of this court's misreading of the trial court opinion.

second stage of the *Griggs* equation that goes beyond the meaning conveyed by the conclusory phrases "business necessity" and "manifest relationship." [5] This circuit selected its approach in *Head v. Timken*

*Roller Bearing Co.*, 486 F.2d 870, 879 (6th Cir. 1973), more than a year after the Tenth Circuit rendered its decision in *Spurlock*.[6] In *Timken Roller Bearing Co.*, Judge Miller wrote for court:

5. In *Griggs v. Duke Power Co., supra,* the Supreme Court held that Title VII prohibits selection "practices that are fair in form, but discriminatory in operation," the "touchstone" being "business necessity." 401 U.S. at 431, 91 S.Ct. at 853. However, the Court in that case did not establish a judicial standard for determining when specific practices are protected by the business necessity defense, since *Duke Power* concededly adopted the selection devices at issue "without meaningful study of their relationship to job performance." *Id.* at 425–6, 431, 91 S.Ct. at 851, 853.

The Supreme Court next addressed the business necessity issue in *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), in which the court held that EEOC Guidelines are entitled to "great deference" in determining whether test score selection practices are manifestly job related. In *New York City Transit Authority v. Beazer,* 440 U.S. 568, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979), the Court held that the plaintiffs' statistical showing failed to establish disparate impact. In addition, the *Beazer,* majority noted in *dicta* that the selection device bore a "manifest relationship" to the employer's business goals of safety and efficiency. In neither of the Court's post-*Griggs* decisions, was further explication given on the nature of the business necessity defense with respect to the kind of non-scored objective selection criteria employed here by Complete Auto Transit.

Since *Griggs* the courts of appeals have had the opportunity to further define the business necessity defense. They have taken basically two approaches. A few of the courts have adopted a broad view of business necessity. *See, e. g., Spurlock v. United States, supra.* A majority of the courts, however, construe the defense narrowly. *See, e. g., Kirby v. Colony Furn. Co.,* 613 F.2d 696 (8th Cir. 1980); *Blake v. City of Los Angeles,* 595 F.2d 1367, 1377 (9th Cir. 1979) (the business necessity defense is "very narrow"); *Parson v. Kaiser Aluminum & Chemical Corp.,* 575 F.2d 1374, 1389 (5th Cir. 1975); *Green v. Missouri Pac. R. R.,* 523 F.2d 1290, 1298 (8th Cir. 1975) (business necessity "connotes an irresistable demand"); *United States v. St. Louis-S.F. Ry.,* 464 F.2d 301, 308 (8th Cir. 1972) (en banc), *cert. denied,* 409 U.S. 1116, 93 S.Ct. 913, 34 L.Ed.2d 700 (1973); (the test is whether there is "compelling need"); and *United States v. Bethlehem Steel Corp.,* 446 F.2d 652, 662 (2d Cir. 1971) ("compelling need"). These two approaches are inconsistent, *see* Note, The Business Necessity Defense to Dispute Impact Liability Under Title VII, 46

U. of Chi.L.Rev. 911, 219 n.48 (1979), and both have their supporters among the commentators. *See, e. g., id.* at 933–4 (broad view of the defense required by legislative history and correct reading of Supreme Court authority); Blumrosen, Strangers in Paradise: *Griggs v. Duke Power Co.* and the Concept of Employment Discrimination, 71 Mich.L.Rev. 59, 83 (1972); (narrow view of the defense required by legislative history and case law); Jain and Ledvinka, Economic Inequality and the Concept of Employment Discrimination, 26 Lab. L.J. 570, (1975) (narrow view required by legislative history); and Note, Business Necessity under Title VII: A No Alternative Approach, 84 Yale L.J. 98, 101–2 (1974) (citing narrow view cases in support of its "no alternative" approach to the defense).

6. By listing *Timken Roller Bearing Co.* at footnote nine as one of the cases requiring an employer to show more than a business purpose in order to make out the business necessity defense, the majority implicitly recognizes that this circuit selected its approach to defining the second stage of the *Griggs* equation in that decision.

At footnote nine, the majority asserts that adherence to *Timken Roller Bearing Co.,* is no longer in order since such an approach "which compels an employer to prove a business necessity defense by showing that there exist no less discriminatory alternatives is, in essence a two-stage analysis since it renders the third step superfluous." In my view, the majority improperly goes out of its way to construe *Timken Roller Bearing Co.* in a manner that would violate *Griggs.*

I agree that a two-stage disparate impact formula is not in accord with *Griggs.* However, *Head v. Timken Roller Bearing* in no way adopted such a formula. This court in *Timken Roller Bearing Co.* simply adopted the analysis of the Fourth Circuit's *Robinson v. Lorillard Corp.,* 444 F.2d 791 (4th Cir. 1971), still the leading case in the area. *See* note 8 *infra.* In that decision, the Fourth Circuit specifically stated that its strict view of business necessity was commanded by *Griggs v. Duke Power Co. See* 444 F.2d at 798 n.6. It also stated that "there must be no acceptable alternative policies" available to the employer. The majority seizes upon this statement in order to aver that *Lorillard* and *Timken Roller Bearing Co.* misallocate the burdens of proof with respect to less discriminatory alternatives. These decisions, however, *did not even address the issue of who has the burden of proving less discriminatory*

The test [for business necessity] is whether there exists an overriding legitimate business purpose such that the practice is necessary to the safe and efficient operation of the business. Thus, the business purpose must be sufficiently compelling to override any racial impact; the challenged practice must effectively carry out the business purpose it is alleged to serve ... *Id.* at 879. (quoting *Robinson v. Lorrillard Co.*, 444 F.2d 791, 798 (4th Cir.), *cert. dismissed pursuant to Rule 60*, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971).

This ruling is not an anomaly as the reference to the decision in footnote nine of the majority opinion might suggest. In fact, *Timken Roller Bearing Co.* has been consistently followed in a long line of subsequent decisions. *See, e. g., Horace v. City of Pontiac*, 624 F.2d 765 (6th Cir. 1980); *Mitchell v. Mid-Continent Spring Co. of Kentucky*, 583 F.2d 275 (6th Cir. 1978); *Equal Employment Opportunity Commission v. New York Times Broadcasting Service, Inc.*, 542 F.2d 356 (6th Cir. 1976); *Equal Employment Opportunity Commission v. Detroit Edison Co.*, 515 F.2d 301 (6th Cir. 1975); *Palmer v. General Mills, Inc.*, 513 F.2d 1040 (6th Cir. 1975); *Afro-American Patrolmens League v. Duck*, 503 F.2d 294 (6th Cir. 1974).[7] Yet, the majority

---

alternatives, much less compress the *Griggs* three-part test into a two-part test. In *Lorillard*, the Fourth Circuit merely listed the following as being required by *Griggs*: (1) compelling business purpose; (2) the challenged practice must effectively carry out the business purpose; and (3) "there must be available no acceptable alternative policies or practices which would better accomplish the business purpose advanced, or accomplish it equally well with a lesser differential racial impact." 444 F.2d at 798. There is nothing about this set of considerations *per se* that would contravene *Griggs*. It is only when one assumes that the court meant to place the burden on the employer of proving the last issue that the analysis can be read as being inconsistent with *Griggs*. The majority makes this unwarranted assumption and then casts aside the entire *Lorillard* analysis. In *Timken Roller Bearing Co.* we did point out that defendants have the burden of proving business necessity, but there we did not address the issue of who has the burden of proving available alternatives. 486 F.2d at 870. Thus, it is clear to me that a more reasonable interpretation of *Lorillard* and *Timken Roller Bearing Co.* is that the decisions simply require a showing of compelling need and a "close fit" in order for an employer to rebut a *prima facie* case. Since the decisions failed to discuss the burden of proving less discriminatory alternatives, the logical conclusion is that plaintiffs would have the burden—even under *Lorillard* and *Timken Roller Bearing Co.* Under this reading, the decisions are consistent with *Griggs* and with *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975). This panel should have adopted this reading and applied the *Timken Roller Bearing Co.* standard here.

In the circuit's most recent decision in the area, *Horace v. City of Pontiac, supra*, this court specifically adopted the district court's invocation of the *Lorillard/Timken Roller Bearing Co.* standard. Incidentally, the court also correctly allocated the burden of proving less discriminatory alternatives in that decision, belying the majority's point that *Lorillard* and *Timken Roller Bearing Co.* are necessarily inconsistent with *Griggs*. *See* 624 F.2d at 768–9. At footnote nine, the majority asserts that there has not been a "litany of faithful adherence to *Head*." In fact, however, no decision of this court has heretofore even questioned the validity of *Timken Roller Bearing Co. See e. g. Palmer v. General Mills, Inc., supra* ("we find that the seniority system provided helpful but not *absolutely essential* training and experience ... we cannot say that the system does not effectively carry out the alleged business purpose, we consider this conclusion to be of comparatively little significance in this case ... [A]s for ... available alternatives it does not appear that any proof was offered on this point at trial.") Therefore, the majority's suggestion—that circuit authority is somehow divided on the issue of whether the test for business necessity is a strict one—is erroneous.

It has been the policy of this circuit that one panel cannot overrule the decision of another panel absent either intervening Supreme Court authority to the contrary or other circumstances which render the precedent clearly wrong. *See Timmreck v. United States*, 577 F.2d 372, 377 n.15 (6th Cir. 1978) *reversed on other grounds*, 441 U.S. 780, 99 S.Ct. 2085, 60 L.Ed.2d 634 (1979). Here, the majority departs from this policy by purporting to overrule in a footnote *Head v. Timken Roller Bearing Co.* It is my hope that both the majority's disregard for circuit precedent and its misanalysis of the business necessity issue will be regarded as aberrational.

7. Other circuits have also found *Timken Roller Bearing Co.* persuasive authority. *See, e. g., Donnell v. General Motors Corp.*, 576 F.2d 1292 (8th Cir. 1978); *Smith v. Olin Chemical Corp.*, 555 F.2d 1283 (5th Cir. 1977) (en banc).

chose to ignore well established circuit precedent in order to rule in favor of the company and to endorse the controversial interpretation of business necessity employed in *Spurlock.*[8] I cannot join in this disregard for circuit precedent. The proper standard here is the one recognized in *Timken Roller Bearing Co.*, the narrow construction of the business necessity defense.

As stated in the preceding section of this dissent, I do not think it was appropriate for this court to have decided whether the company made out its business necessity defense. However, since the majority goes on to decide this issue, I am compelled to express my view that the company failed to meet its burden of establishing business necessity under the *Timken Roller Bearing Co.* or *Robinson v. Lorrillard Corp.* standard.

The evidence at trial indicated that driving trucks was a very small part of the total activities of the company's yard employees. Mr. Thompson, vice-president of the compa-ny, estimated that *at most* yard employees spent four percent of their work day utilizing skills developed in over-the-road truck driver training. He also noted that some of the yard employees never drove the trucks; they worked entirely on the release gate. In addition, the evidence clearly indicates that Complete Auto Transit employees can and have performed over-the-road truck driving safely and efficiently without formal schooling or two years experience. Nine out of 16 of the employees hired before 1973 had no such training and yet they have performed the job of yard employee to the company's satisfaction. The evidence indicates that these employees were adequately prepared for the job of yard employee after undergoing a minimal amount of on-the-job training.[9]

The most compelling reason for rejecting the company's business necessity contention, however, is that after the wildcat strike of 1976 the company terminated its experience-school requirement.[10] The com-

---

**8.** *See* note 5, *supra.* In *Spurlock*, the Tenth Circuit held:

"[W]hen a job requires a small amount of skill and training and the consequences of hiring an unqualified applicant are insignificant ... the employer should have a heavy burden to demonstrate ... that ... [the] criteria are job related. On the other hand, when the job clearly requires a high degree of skill and the economic and human risks involved in hiring an unqualified applicant are great, the employer bears a correspondingly lighter burden to show that his employment criteria are job related. 475 F.2d at 219.

The majority cites the recent Fourth Circuit *en banc* decision in *Burwell v. Eastern Airlines*, 633 F.2d 361 (4th Cir. 1980) apparently as a case following the *Spurlock* rationale. In *Burwell*, the court did hold that the airline's interest in maintaining passenger safety was relevant to a determination of business necessity. However, the court made clear in its *per curiam* opinion that the test for business necessity "is whether there exists an overriding legitimate business purpose such that the practice is necessary to the safe and efficient operation of the business." *Id.* at 371. At Note 11, the court specifically stated that "[T]he criteria for establishing the defense has been no where better stated than in *Robinson v. Lorillard.*" (citations omitted). Therefore, contrary to what the majority suggests, it is evident that the Fourth Circuit continues to narrowly con-strue the business necessity defense. It does not endorse the Tenth Circuit's sliding scale approach to the allocation of burdens under the defense.

**9.** In addition, Appellee Mary Chrisner satisfactorily worked as a yard employee during the 1976 wildcat strike. At the time she met neither prong of the company's selections requirements.

**10.** Although the company instituted the experience-school requirement in 1973, it hired no yard employees until April 29, 1976. Four months later, the company dropped the requirement during a wildcat strike. This requirement was never reinstituted.

At trial, the company alleged that adoption of the experience-school requirement was motivated by the need for yard employees to transport trucks to an overflow lot. This task required a short drive over the public highway. The company, however, never explained why the experience-school requirement was not necessary after 1976. Apparently, the task of transporting trucks to the overflow lot remained a small part of yard employee responsibility, but after the strike, the company began accepting applicants who had only a chauffeur's license and a physical examination. Therefore, *in the absence of rebutting evidence* I would think the logical conclusion is that the experience-school requirement was not "necessary" before the strike either.

pany offered absolutely no evidence to explain why the requirement was "necessary" during the four months it was in operation and then apparently unnecessary when the company terminated the requirement. From the evidence presented, it appears that Complete Auto Transit Inc. has operated safely and efficiently without the selection device. Therefore, it is erroneous for the majority to baldly conclude that the company proved that its selection device was so compelled by considerations of safety and efficiency as to override the device's grossly disparate impact on women.[11] Accordingly, the evidence below, in my view, cannot adequately support a finding of business necessity.

---

The majority states: "The performance of this task in a satisfactory manner requires a certain degree of skill in operating the tractor-trailers. The company's goal of transporting its freight in a safe and efficient manner is significantly served by hiring experienced truck drivers. An individual who possesses experience in driving large, unwieldly vehicles is obviously a more rational choice for the job than a person who has not demonstrated ability to drive such vehicles." These observations, however, are not sufficient to support a finding of business necessity in this case. The company never introduced evidence validating the experience-school requirement as an appropriate measure of the "degree of skill" needed to operate the trucks in a satisfactory over-the-road manner. The majority engages in troublesome appellate factfinding when it states that an applicant who meets the criteria is "obviously a more rational choice for the job" than a person who does not meet them. This kind of speculation is inappropriate, particularly in view of the fact that the company no longer subscribes to the policy.

11. Even if *Spurlock v. United Airlines, supra*, did provide the applicable standard for this circuit, which it clearly does not, the majority was still incorrect in finding that Complete Auto Transit made a showing of business necessity below. It is not enough to state that safety on the roads is an important public interest. That is certainly true. But under *Griggs*, the company has the burden of proving that the selection device was manifestly related to the protection of the public interest. In other words, an employer must validate a selection device, even under *Spurlock*, by introducing evidence which demonstrates that without the selection device the public would be harmed. Complete Auto Transit made no such showing here. Indeed, the company on its own apparently concluded after the wildcat strike that the public interest was adequately served by selecting yard employees who possessed only a chauffeur's license and who had been given a physical examination.